817 A.2d 347

COALITION FOR QUALITY HEALTH CARE, NEW JERSEY ASSOCIATION OF OSTEOPATHIC PHYSICIANS & SURGEONS, SOUTHERN NEW JERSEY CHIROPRACTIC SOCIETY, MONMOUTH/OCEAN CHIROPRACTIC SOCIETY, NEW JERSEY SOCIETY OF PHYSICAL MEDICINE AND REHABILITATION, NEW JERSEY CHIROPRACTIC SOCIETY, AMERICAN CHIROPRACTIC ASSOCIATION, AND DENTISTS FOR QUALITY CARE, APPELLANTS, v. NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, DIVISION OF INSURANCE, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 15, 2003—Decided March 7, 2003.

Before Judges KING, WECKER and LISA.

*Arthur F. Pavluk* argued the cause for appellants (*Barrett & Pavluk*, attorneys; *Tracy A. Siebold*, on the brief).

*Doreen J. Piligian* argued the cause for respondent (*David Samson*, Attorney General, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel; *Ms. Piligian* and *Karyn G. Gordon*, Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

In this case, eight non-profit organizations of health care professionals appeal from the adoption of regulations by the Commissioner of Banking and Insurance (Commissioner): *N.J.A.C.* 11:3–29 Appendix, Exhibit 1; *N.J.A.C.* 11:3–29.4(m); and *N.J.A.C.* 11:3–29.4(*o*). Appellants argue that the Commissioner violated *N.J.S.A.* 39:6A–4.6 and acted outside the authority delegated to her under the statute by basing the revised fee schedule for reimbursement of medical treatment covered by personal injury protection (PIP) laws (Exhibit 1) on paid fees rather than billed fees; violated the statute and exceeded her authority by imposing a daily fee cap of $90 in subsection 29.4(m); and impermissibly intruded upon the regulation of the practice of medicine and chiropractic by limiting the provision of evaluation and management services in subsection 29.4(*o*). We reject appellants' contentions and affirm.

I

The procedural history and factual background of this regulatory dispute is generally set forth in detail in our companion opinion in *In the Matter of the Commissioner's Failure to Adopt 861 CPT*

*Codes and To Promulgate Hospital and Dental Fee Schedules,* A–6787–00T2, filed on this date.

On July 2, 2001 appellants filed a notice of appeal from the entire adoption, on April 24 and June 22, 2001, of the rules and amendments to *N.J.A.C.* 11:3–29. At the same time, appellants sought from the Department a stay pending appeal; the Department denied a stay on July 10, 2001. The arguments in appellant's brief are limited to the Appendix of Exhibit 1 and *N.J.A.C.* 11:3–29.4(m) and (o).

## II

Appellants contend that, by basing Exhibit 1 (physicians' fee schedule) on paid fees rather than billed fees, the Department of Banking and Insurance (Department) exceeded the scope of its legislative authority and acted contrary to legislative intent. The Department responds that it acted within its ample discretion to establish fee schedules. Notwithstanding our reversal and remand for reproposal in A–6787–00T2, we consider this issue on the merits. The charged-fee versus paid-fee issue must be resolved at some point. It is better resolved now than later.

The underlying statutory authority most pertinent to this appeal is found in *N.J.S.A.* 39:6A–4.6(a):

The Commissioner of Banking and Insurance shall, within 90 days after the effective date of P.L.1990, c. 8 (C.17:33B–1 et seq.), promulgate medical fee schedules on a regional basis for the reimbursement of health care providers providing services or equipment for medical expense benefits for which payment is to be made by an automobile insurer under personal injury protection coverage pursuant to P.L.1972, c. 70 (C.39:6A–1 et seq.), or by an insurer under medical expense benefits coverage pursuant to section 2 of P.L.1991, c. 154 (C.17:28–1.6). These fee schedules shall be promulgated on the basis of the type of service provided, and shall incorporate the reasonable and prevailing fees of 75% of the practitioners within the region. If, in the case of a specialist provider, there are fewer than 50 specialists within a region, the fee schedule shall incorporate the reasonable and prevailing fees of the specialist providers on a Statewide basis. The commissioner may contract with a proprietary purveyor of fee schedules for the maintenance of the fee schedule, which shall be adjusted biennially for inflation and for the addition of new medical procedures.

In December 2000, Ingenix, Inc., a benefits consultant hired by the Department, submitted a report recommending revised fee schedules. This report made clear that the Department had directed the use of paid fees rather than billed fees as the basis for recommended revisions. The report stated:

> The intent was to revise the fee schedules consistent with the Department's interpretation of the statutory requirement stating the fee schedules are to "incorporate the reasonable and prevailing fees of 75 percent of the practitioners within the region." This interpretation is based on the understanding that the term "reasonable and prevailing fees" refers to the fee paid rather than the fee charged for the service.
>
> Historically it was common for fee schedules to be based on charge data, however, with the assimilation of managed care in the industry and the influence of HCFA's [the federal Health Care Financing Administration] Medicare fee schedule, the basis and level of fee schedules has changed, in some cases quite dramatically, over the past several years. To further complicate the definition of prevailing fees, a provider often has various fees depending on the payer of the service (e.g. Medicare, Medicaid, managed care organization, indemnity organization, etc.). Consistent with this variation in provider fees is the variability in payment levels by the different payers.

Appellants claim that this interpretation is unreasonable, and that "reasonable and prevailing fees of 75% of the practitioners within the region" in *N.J.S.A.* 39:6A–4.6(a) necessarily refers to billed fees. Appellants also object that the Department took into consideration medical fee schedules and workers' compensation schedules from Connecticut and Washington. The references to those states in the response to a comment were directed to the issue of the $90 cap. Moreover, as the Department points out, the out-of-state figures were used for comparison only.

The Department does not dispute the assertions of appellants that since *N.J.S.A.* 39:6A–4.6 was first enacted, in 1988, as part of the Automobile Insurance Reform Act, *L.* 1988, *c.* 119, billed fees have been the basis for medical fee schedules, and that since 1990 when the critical "reasonable and prevailing fees" language first appeared in *N.J.S.A.* 39:6A–4.6, *L.* 1990, *c.* 8, § 7, this language has been understood to refer to billed fees. Although the Department acknowledges this history, it responds that over the years, paid fees have diverged significantly from billed fees, making paid fees a much more accurate measure of "reasonable and prevailing

fees." The Department stated in the summary section of the proposal at issue:

> The Department's previous medical fee schedules for physicians' services and dental services were created as a statistical reflection of [ ] billed fee data at the 75th percentile, with some adjustments to address statistical variations and anomalies.
>
> During the years that the fee schedules have been in effect, it has become apparent to the Department that there is an increasing difference between fees billed by health care providers and the fees actually accepted by them as payment for services rendered.
>
> . . . .
>
> Since it is clear that the purpose of the medical fee schedule statute is to contain costs while providing a fair level of reimbursement for services based on what providers receive in the market, the revised fee schedule utilizes actual levels of reimbursement paid to health care providers, including those paid by government programs, participating provider agreements and other contractual arrangements between physicians and health care plans, to develop the schedule incorporating the "reasonable and prevailing fees of 75% of the practitioners."
>
> For the reasons set forth above, the revised fee schedules were developed using the more accurate level of fees as represented by reimbursements to providers from a variety of sources, not simply the fees as billed by providers.
>
> [32 *N.J.R.* 4332(a), 4333 (December 18, 2000).]

Despite the history of basing fee schedules on charged fees, using fees actually paid as the basis for "reasonable and prevailing fees of 75% of the practitioners" is not, in our view, arbitrary or capricious. Indeed, if, as the Department asserts, and appellants do not factually dispute, providers routinely accept significantly less than the amount they purport to charge, then paid fees are a realistically more accurate measure of reasonable and prevailing fees than billed fees. Appellants maintain that the use of paid, rather than charged fees, is an unfair and unauthorized measure of reasonableness. We disagree.

Appellants contend that the use of paid fees violates legislative policy, and the language of *N.J.S.A.* 39:6A–4.6(c), which states that patients are not liable "for any amount of money which results from the *charging* of fees in excess of those permitted by the medical fee schedules established pursuant to this section" [emphasis added], which they claim supports their interpretation. Again, we disagree. The prohibition against collecting additional

fees above the specified fee schedule naturally applies to charged fees. This does not mean that the fee schedule itself must be based on charged fees.

Appellants' reliance on a letter from a legislator and on his testimony at a post-enactment regulatory hearing in order to establish earlier legislative intent, is misplaced. In response to similar reliance by an appellant in a previous case, we explained that post-enactment statements of legislators as extrinsic evidence of legislative intent are disapproved, in contrast to contemporaneous sponsor statements, because they are of limited legal relevance or value. *New Jersey Coalition of Health Care Professionals, Inc. v. N.J. Dep't of Banking and Ins.*, 323 *N.J.Super.* 207, 255, 732 *A*.2d 1063 (App.Div.1999) (citing 2A *Singer's Sutherland Statutes and Statutory Construction*, § 48.20 (1999 and Supp.)).

Appellants also contend that this fee revision, rather than representing the biennial adjustment for inflation mandated by *N.J.S.A.* 39:6A–4.6(a), actually reduced most fees. The language of *N.J.S.A.* 39:6A–4.6(a) directs the Department to adjust the fee schedules for inflation every two years. *Matter of Failure by Dep't of Banking and Ins.*, 336 *N.J.Super.* 253, 264, 764 *A*.2d 494 (App.Div.2001). The Department does not dispute that it has defaulted in making timely biennial adjustments but claims it is now attempting to do so.

The Ingenix report stated that, for physicians' services, the "allowed data was not trended forward for inflation Ingenix does not typically trend the allowed data because allowed amounts do not necessarily increase over time with inflation as do billed amounts, but allowed amounts often have a tendency to decrease." This is perhaps not unexpected where cost control is a factor. Recently we acknowledged, "Any fee schedule that the Department adopts after AICRA, pursuant to *N.J.S.A.* 39:6A–4.6a, must of necessity consider and conform with AICRA's legislative intent, and we cannot conceive of the Legislature wishing the Department to adjust the existing schedule for inflation, without considering the cost saving goals of AICRA." ("AICRA" is the Automobile

Insurance Cost Reduction Act of 1998. *L.* 1998, *c.* 21 and *c.* 22.) *Id.* at 266–67, 764 *A.*2d 494. We agreed with the Department's interpretation of its statutory direction "to permit the Department to recognize that inflationary or deflationary forces during a two-year period might render unnecessary a particular adjustment." *Id.* at 264, 764 *A.*2d 494.

In that same case, we noted that although the challenger contended that only an inflationary adjustment was required to promulgate a dental fee schedule, "the Department has indicated, in a valid exercise of discretion, that it had previously relied on 'billed fee data' and would prefer to base its revised schedule on the more accurate market, or 'paid fees.' " *Id.* at 265, 764 *A.*2d 494. The issue before us was the Department's delay in revising the dental fee schedule, so this comment was dicta, but we clearly perceived reliance on paid fees as within the discretion of the Department.

Appellants here also claim that the Department unfairly discriminates against certain health care providers (chiropractors, neurologists, psychiatrists and primary care physicians), compelling them to bear the brunt of cost containment. They contend that the Department discriminates by using paid fees when devising their fee schedules, whereas it used billed fees when devising the dental fee schedule. The applicable test, of course, is whether the distinction is arbitrary, capricious or unreasonable.

The Department explained when proposing the dental fee schedule that "unlike medical providers, most dentists do not enter into fee discounting arrangements with health payers and collect their billed fees." 33 *N.J.R.* 3617, 3618 (October 15, 2001). Appellants dispute the truth of that statement, offering evidence that dental plans are in use. They offer no evidence of widespread discounting arrangements among dentists, however, and they bear the burden of proof in this challenge. The basis for the Department's differential approach is not unreasonable on the record before us.

Appellants also object that all other providers for whom no schedule has yet been developed (e.g., hospitals and emergency medical providers) have an unfair advantage because the usual, customary and reasonable (UCR) fee standard is more generous to providers than this fee schedule. However, the implementation of economic legislation is the responsibility of the agency, which has wide discretion in deciding how to accomplish that task. *See Matter of Failure*, 336 *N.J.Super.* at 262, 764 *A.*2d 494 (cautioning, "We cannot micromanage any administrative agency.").

Within the "billed fees" argument, appellants include a challenge to the limitation on reimbursement for bilateral procedures found in *N.J.A.C.* 11:3–29.4(f)(1):

> When multiple or bilateral procedures are performed on the same patient by the same provider at the same time or during the same visit, it is virtually never appropriate for the fee to be the sum of the fees for each procedure. The primary procedure at a single session shall be paid at 100 percent of the eligible charge, the second procedure at no more than 50 percent of the upper limit in the fee schedule for that particular procedure, and if performed, any additional procedures at no more than 25 percent of the upper limits in the fee schedule for those particular procedures.

We conclude this argument also lacks merit. The statute expressly permits this type of regulation, stating, "In the case of multiple procedures performed simultaneously, the fee schedule and regulations promulgated pursuant thereto may also provide for a standard fee for a primary procedure, and proportional reductions in the cost of the additional procedures." *N.J.S.A.* 39:6A–4.6(b). Appellants contend that this regulation is different from the Medicare guidelines and is illogical because surgical repair of two fractured arms or two crushed femurs, for example, would present twice the difficulty. However, this regulation is authorized by the statute which contemplates the possibility of exceptions in the appropriate unusual circumstances.

We find the use of paid fees rather than billed fees as the basis for the fee schedule for certain providers but not for dentists is within the discretion of the Department.

## III

■ Appellants next claim that, by establishing a daily fee cap, the Department exceeded its legislative authority, violated the plain language of *N.J.S.A.* 39:6A–4.6(b), and acted arbitrarily and capriciously. The Department claims that imposition of the daily fee cap was reasonable. We agree with the Department.

*N.J.S.A.* 39:6A–4.6(b) provides:

The fee schedule may provide for reimbursement for appropriate services on the basis of a diagnostic-related (DRG) payment by diagnostic code where appropriate, and may establish the use of a single fee, rather than an unbundled fee, for a group of services if those services are commonly provided together. In the case of multiple procedures performed simultaneously, the fee schedule and regulations promulgated pursuant thereto may also provide for a standard fee for a primary procedure, and proportional reductions in the cost of the additional procedures.

*N.J.A.C.* 11:3–29.4(m) provides:

The daily maximum allowable fee shall be $90.00 for Physical Medicine and Rehabilitation procedures (CPT 97001 through 98943) but not including Osteopathic Manipulative Treatment actually performed by the osteopathic physician or a medical doctor (CPT 98925 through 98929). The daily maximum applies when such services are performed for the same patient on the same date. However, an insurer is not prohibited from reimbursing providers in excess of the daily maximum where a patient has serious traumatic injuries to more than one area of the body.

Appellants do not directly dispute the amount of the daily fee cap; they challenge the right of the Department to impose any daily cap at all. They view the rule as inflexible, because it applies no matter how many different practitioners, even unrelated ones, provide care for a patient in a single day. They contend that permitting an insurer to choose which provider to reimburse in such instances, and permitting an insurer to determine when the exception for "serious traumatic injuries" applies, improperly confers on insurers unrestrained discretion. Appellants also contend that the exemption of osteopathic manipulative treatment from the daily maximum, arbitrarily differentiates between osteopathic manipulation and chiropractic manipulation, resulting in disparate reimbursements for similar treatments. They argue that this demonstrates further that the cap is unreasonable. The Department responds that the $90 daily fee cap is more advanta-

geous to providers than the previous multiple procedures reduction formula in the former *N.J.A.C.* 11:3–29.4(f).

During the pendency of this appeal, the Department proposed amendments to *N.J.A.C.* 11:3–29.4(m), which would limit the codes to which the daily maximum applies, and listed them, describing more specifically the circumstances warranting waiver. 34 *N.J.R.* 1237(a), 1237–38 (March 18, 2002). The proposed amendment includes an appendix listing the twenty-six CPT codes which are subject to the daily maximum. *Id.* at 1238. The proposed amendment would also replace the words "a patient has serious traumatic injuries to more than one area of the body," with the following description of the circumstances justifying exceeding the cap:

> [where] the severity or extent of the injury is such that extraordinary time and effort is needed for effective treatment. Such injuries could include, but are not limited to, severe brain injury and non-soft-tissue injuries to more than one part of the body. Treatment that the provider believes should not be subject to the daily maximum shall be billed using modifier –22 as designated in CPT for unusual procedural services. Unless already provided to the insurer as part of a decision point review or precertification request, the billing shall be accompanied by documentation of why the extraordinary time for [sic] effort for treatment was needed.
>
> *[Ibid.]*

In the accompanying summary, the Department said, "The elimination of some CPT codes from the daily maximum will result in increase[d] reimbursement for some procedures that are not commonly provided together and should not have been included in the cap." *Id.* at 1237.

The proposed amendments appear to us to address appellants' argument about disparate reimbursement for similar treatment. Moreover, only twenty-six procedures are subject to the daily maximum. Although appellants emphasize that the cap applies no matter how many practitioners a patient visits in one day, it applies only to certain physical medicine and rehabilitation procedures. Selecting these twenty-six procedures is within the expertise of the Department, in our view. If adopted, this proposed amendment would cure many of appellants' objections. In any

event, imposition of the daily fee cap was within the discretion of the Department under the enabling legislation.

## IV.

Appellants next contend that, by limiting the provision of evaluation and management services, the Department exceeded the scope of its legislative authority, impermissibly regulating the practice of medicine and chiropractic. The Department responds that the reimbursement limitations for evaluation and management services are within the grant of authority in *N.J.S.A.* 39:6A–4.6. We agree with the Department.

*N.J.A.C.* 11:3–29.4(*o*) provides:

Follow-up evaluation and management services for the re-examination of an established patient shall be reimbursed in addition to physical medicine and rehabilitation procedures only when any of the circumstances set forth in (*o*)1 through 4 below is present and not more than twice in any 30 day period. Modifier –25 shall be added to an evaluation and management service when a significant separately identifiable evaluation and management service is provided and documented as medically necessary as follows:

1. There is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

2. The patient fails to respond to treatment, requiring a change in the treatment plan;

3. The patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

4. It is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

Appellants argue that any limitation on evaluation and management visits, particularly in conjunction with the $90 daily fee cap imposed by *N.J.A.C.* 11:3–29.4(m), amounts to an impermissible regulation of medical practice, because it restricts the use of professional judgment in adjusting individual treatment plans. They argue that such regulation is the exclusive province of the Board of Medical Examiners and other licensing boards for medical professionals. *See N.J.S.A.* 45:9–1 to –22.20 (controlling practice of medicine and surgery in general). Appellants contend that the four numbered bases for justifying re-examination of an established patient will not permit adequate individualized treat-

ment.  Because the four factors require health care providers to explain commonplace treatment decisions, they will result in delay, under-treatment and probably malpractice.  Appellants assert that adherence to the regulation would not provide a defense against a malpractice suit, nor could a health care provider assert third-party rights against the Department.

The Department responds that appellants' dire predictions are purely speculative and unsupported by any evidence.  We agree.  This limit on fee reimbursement is not beyond the scope of the authority delegated by the Legislature to the Department unless that reimbursement is shown to be unreasonable and capricious.  Appellants have not made that showing.  We find the guidelines are reasonable and flexible.  We find no improper regulation of the practice of medicine or chiropractic.

Affirmed.