979 A.2d 770 (2009)
410 N.J. Super. 6
In re ADOPTION OF N.J.A.C. 11:3-29 by the STATE of New Jersey, DEPARTMENT OF BANKING AND INSURANCE.
DOCKET NO. A-0344-07T3
Superior Court of New Jersey, Appellate Division.
Argued January 26, 2009.
Decided August 10, 2009.
*773 Joseph M. Gorrell, Roseland, argued the cause for appellants Alliance for Quality Care, Inc., New Jersey Association of Osteopathic Physicians and Surgeons, Orthopaedic Surgeons of New Jersey, Interventional Pain Society, Atlantic Orthopedic Associates, Medical Society of New Jersey, New Jersey Association of Ambulatory Surgery Centers, and New Jersey State Society of Anesthesiologists (Brach Eichler, L.L.C., attorneys; Mark E. Manigan and Mr. Gorrell, of counsel; Mr. Gorrell and Richard B. Robins, on the brief).
Kristine A. Maurer, Deputy Attorney General, argued the cause for respondent Department of Banking and Insurance (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Maurer, on the brief).
Thomas P. Weidner, Princeton, argued the cause for intervenors American Insurance Association, Insurance Council of New Jersey, and Property Casualty Insurers Association of New Jersey (Windels, Marx, Lane & Mittendorf, attorneys; Mr. Weidner, of counsel; Mr. Weidner, Antonio J. Casas and Lisa D. Cornacchia, on the brief).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
N.J.S.A. 39:6A-4.6 requires the Commissioner of the Department of Banking and Insurance (the Department) to set a physicians' fee schedule, pursuant to which providers of medical care to accident victims are paid. The fee schedule "shall incorporate the reasonable and prevailing fees of 75% of the practitioners within the region." N.J.S.A. 39:6A-4.6. To implement the statutory mandate, the Department promulgated new regulations and *774 amendments to N.J.A.C. 11:3-29, as well as a personal injury protection (PIP) physician's fee schedule. Appellants Alliance for Quality Care, Inc., the New Jersey Association of Osteopathic Physicians and Surgeons, Orthopaedic Surgeons of New Jersey, the Interventional Pain Society, Atlantic Orthopedic Associates, the Medical Society of New Jersey, the New Jersey Association of Ambulatory Surgery Centers and the New Jersey State Society of Anesthesiologists, challenge the Department's amendments, rules, regulations and fee schedule as violative of the statute. Respondent the Department, as well as intervenors the American Insurance Association, the Insurance Council of New Jersey and the Property Casualty Insurers Association of New Jersey, assert that the rules, regulations and schedule are statutorily appropriate.
We conclude that the rules, regulations and fee schedule are valid; however, as to N.J.A.C. 11:3-29.4(e)(1), we conclude that the use of the specific Ingenix UCR database for the reasons set forth, infra, should be enjoined pending further action by the Department. In all other respects, we affirm.

I.

A.
We provide a brief procedural synopsis of this appeal. On September 5, 2006, after eliciting pre-proposal comments pursuant to N.J.S.A. 52:14B-4(e) and N.J.A.C. 1:30-5.3(a), the Department proposed new rules and amendments to N.J.A.C. 11:3-29, which would modify the physicians' fee schedule for reimbursement to medical providers, by publishing them in the New Jersey Register. 38 N.J.R. 3437(a) (September 5, 2006).
On August 29, 2007, the Commissioner adopted the new and amended rules, and on August 31, 2007, he filed a notice of adoption of the rule proposal with the Office of Administrative Law, with an effective date of October 1, 2007. Appellants challenged the adoption of the rules,[1] intervenors were granted leave to intervene, and we granted a stay of the implementation of the rules pending our review.

B.
To place this appeal in appropriate context, we provide a history of PIP reimbursement legislation and its implementation. The "No Fault Act," N.J.S.A. 39:6A-1 to -35, was enacted in 1972. It had four objectives: "1) prompt reparation to accident victims[;] 2) cost containment of automobile insurance[;] 3) availability of insurance[;] and 4) easing of the judicial caseload." Cobo v. Market Transition Facility, 293 N.J.Super. 374, 384, 680 A.2d 1103 (App.Div.1996). To meet the objectives, N.J.S.A. 39:6A-4 mandated that every standard automobile liability insurance policy contain PIP benefits for the payment of medical benefits, without regard to negligence, liability or fault, to the named insured and members of his or her household who sustained bodily injury as the result of contact with an automobile.
In 1988, the Legislature enacted N.J.S.A. 39:6A-4.6 as a "cost containment measure." In re the Failure by the Dep't of Banking and Ins. to Transmit a Proposed Dental Fee Schedule to the OAL for Publication in the N.J. Register, 336 N.J.Super. 253, 256, 764 A.2d 494 (App. Div.), certif. denied, 168 N.J. 292, 773 A.2d *775 1155 (2001); L. 1988, c. 119, § 10. This provision required the Commissioner to promulgate a medical fee schedule on a regional basis for the reimbursement of PIP claims. L. 1988, c. 119, § 10, as amended by L. 1988, c. 156, § 4. As initially adopted, the Commissioner was required to base the claims on "the type of service provided" and was to review the fee schedules biennially. Ibid.
In 1990, the Fair Automobile Insurance Reform Act (FAIRA) was enacted to reform the motor vehicle insurance system to "achieve economy and lower insurance costs." In re Failure to Transmit, supra, 336 N.J.Super. at 256, 764 A.2d 494; L. 1990, c. 8. As part of the reform, N.J.S.A. 39:6A-4 was amended to require, among other things, that the PIP reimbursement rates established within the fee schedule "incorporate the reasonable and prevailing fees of 75% of practitioners within the region." L. 1990, c. 8, § 7. If there were fewer than fifty specialists within a region, the fee schedule would "incorporate the reasonable and prevailing fees of the specialist providers on a statewide basis." Ibid. The law still required that the Commissioner review the schedules biennially. Ibid. FAIRA also prohibited health care providers from demanding or requesting any payment in excess of those permitted in the fee schedules. Ibid.
In 1997, the Legislature amended N.J.S.A. 39:6A-4.6. L. 1997, c. 151, § 33. The new law stated that "the Commissioner may contract with a proprietary purveyor of fee schedules for the maintenance of the fee schedule, which shall be adjusted biennially for inflation and for the addition of new medical procedures." Ibid. Additionally, the new law provided:
The fee schedule may provide for reimbursement for appropriate services on the basis of a diagnostic related (DRG)[[2]] payment by diagnostic code where appropriate, and may establish the use of a single fee, rather than an unbundled fee, for a group of services if those services are commonly provided together. In the case of multiple procedures performed simultaneously, the fee schedule and regulations promulgated pursuant thereto may also provide for a standard fee for a primary procedure, and proportional reductions in the cost of the additional procedures.
[Ibid.]
In 1998, the Legislature passed the Automobile Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-1 to -35, which was a further attempt to "preserve the no-fault system" and "reduc[e] unnecessary costs." N.J.S.A. 39:6A-1.1(b). Under N.J.S.A. 39:6A-1.2, the Commissioner was given the power to "promulgate any rules and regulations ... deemed necessary in order to effectuate the provisions of this amendatory and supplementary act."
The first PIP physicians' fee schedule was adopted in January 1991, under N.J.A.C. 11:3-29. 23 N.J.R. 536 (Feb. 19, 1991). It listed 1,100 medical procedures identified by Current Procedural Terminology (CPT) codes. 23 N.J.R. 539-71 (Feb. 19, 1991). The reimbursement fees were ceilings; if the provider's usual, customary, and reasonable (UCR) fee was less than the ceiling, the provider had no right to the higher fee set forth in the fee schedule. N.J.A.C. 11:3-29.4(a). An insurer's *776 obligation to pay for any service or equipment not listed on the fee schedule was not to exceed "the [provider's] usual, customary and reasonable fee." N.J.A.C. 11:3-29.4(a). See Cobo, supra, 293 N.J.Super. at 384-85, 680 A.2d 1103.
Several adjustments were made over the next nine years. See 25 N.J.R. 3466 (Aug. 2, 1993), 28 N.J.R. 3962 (Aug. 19, 1996), and 29 N.J.R. 887 (March 17, 1997). In 1997, after the law was changed to allow the Commissioner to "`contract with a proprietary purveyor of fee schedules,'" the Department contracted with Ingenix to revise the fee schedule. 32 N.J.R. 4332(a) (Dec. 18, 2000). "Ingenix assembled New Jersey specific data from both proprietary and public data bases of billed and charged fees to develop the new proposed fee schedules." Ibid.
In December 2000, the Department proposed changes that represented a shift in policy. Up until that time, the fee schedule was based on data regarding "`billed' fees, that [was], the fee charged or set forth on the bill by providers and submitted to health insurers (and ultimately reported by them to commercial compilers of health care fee data)." Ibid. The fee schedules "were created as a statistical reflection of this billed fee data at the 75th percentile ...." Ibid.
The Department noted that during the years the fee schedules had been in effect, it had "become apparent" that there was "an increasing difference between fees billed by health care providers and the fees actually accepted by them as payment for services rendered." Ibid. The Department noted that the amount charged on the Explanation of Benefits (EOB) form was "almost always higher than the payment to the provider by the health benefit carrier." Ibid.
The Department attributed the difference between the billed fees and the paid fees to "several causes including: a) the prevalence of government-sponsored medical programs such as Medicare and Medicaid, which reimburse[d] health care providers at a level lower than the level of fees billed;" b) a substantial amount of medical fees that were paid to providers by health service corporations, which were paid at a level lower than the 75th percentile of billed fees; and c) the significant increase over the previous ten years of physicians who had entered into contractual arrangements that set agreed fees with health benefit carriers or networks that were at a discount of the physicians' usual fees. Ibid.
Citing the purpose of the medical fee schedule statute as containing costs while providing a fair level of reimbursement for services, the fee schedule proposed in 2000 used actual levels of reimbursement paid to health care providers, including those paid by government programs, participating provider agreements and other contractual arrangements between physicians and health care plans to develop the schedule incorporating the reasonable and prevailing fees of 75% of practitioners. Ibid.
The Department's use of paid fees rather than billed fees was challenged and upheld in Coalition for Quality Health Care v. New Jersey Department of Banking and Insurance, 358 N.J.Super. 123, 126-31, 817 A.2d 347 (App.Div.2003) ("Coalition III").
Another amendment in the 2000 rules imposed a daily fee cap of $90 for CPT codes that were commonly billed together. 33 N.J.R. 1592, 1597 (May 21, 2001). This change was also challenged and upheld in Coalition III, supra, 358 N.J.Super. at 132-34, 817 A.2d 347.
In a companion case decided the same day, because of deficient notice and substantial deviation from the rule proposal, *777 we reversed the Department's adoption of the physicians' fee schedule and remanded to the Department for reproposal, new notice and public hearing. In re the Commissioner's Failure to Adopt 861 CPT Codes, supra, 358 N.J.Super. at 139, 147, 817 A.2d 355. Despite the procedural infirmities, we did not void the adopted fee schedule, and the schedule remained in effect pending further agency action. Id. at 147, 817 A.2d 355.
In response to Failure to Adopt, in 2005, the Department began the process of formulating amendments and additions to the physicians' fee schedule through "discussions with interested parties" concerning a pre-proposal draft dated July 8, 2005.
The Department contracted again with Ingenix, which provided information on paid fees at the 80th percentile in preferred provider organizations (PPOs). 38 N.J.R. 3437(a) (September 5, 2006). For comparison to other payers, the Department looked at the Medicare Part B participating provider fee schedule (MPFS), the use by other states of fee schedules based on a multiple of the MPFS and the New York Worker's Compensation and No Fault Fee Schedule. Ibid.
The Department determined that because the MPFS was "extremely comprehensive" and "resource based," it was appropriate to calculate the new physicians' fee schedule "as percentages of the current Medicare fee schedule." Ibid. The Department used a "multiplier" of 120% of the MPFS because it "corresponded well to much of the paid fee data collected ... [.]" Ibid. The Department explained that using the MPFS was an appropriate base for calculating the PIP fees because:
The Centers for Medicare and Medicaid Services (CMS) with input from the provider community, calculate a relative value unit (RVU) for the physician work, practice expenses and malpractice premium expense for each Current Procedural Terminology (CPT) code. These RVUs are then adjusted by a geographic practice cost index (GPCI) that reflects the impact of the costs of physician work, practice expenses and malpractice cost in a specific geographic region. The result is multiplied by a dollar amount known as the Medicare conversion factor to produce the fees for each Medicare region.
[Ibid.]
The draft also defined, for the first time, ambulatory surgery centers (ASCs), facilities where ambulatory surgical cases are performed separate and apart from any other facility (such as a hospital) license. Because Ingenix lacked a database of facility fees for ASCs, the Department gathered and examined the MPFS for ASC facility fees which had recently been set by CMS. Ibid.
Other changes in the first draft included: 1) the addition of over 1000 CPT codes (the fees for which were calculated by multiplying the Medicare rate by 120%); 2) the reduction of the fee regions from three to two; 3) the setting of the UCR reimbursement amount for services or equipment not on the fee schedules at 120% of Medicare rates; 4) the redefinition of the multiple procedures reduction formula to apply only to surgical procedures and to conform it to the Medicare standard of 100% for the first procedure, 50% for the second procedure, and 25% for the third procedure; 5) the reimbursement of physicians' services provided in trauma units at Level I and II trauma hospitals to 120% of the fee schedule or 140% of Medicare for those procedures not on the fee schedule; and 6) the expansion of the list of CPT codes subject to the daily maximum.
*778 The Department held thirteen meetings and several conference calls with interested parties concerning the draft proposal. The Department received a number of complaints from surgeons and emergency care physicians, who threatened to stop treating auto accident victims due to the low and, in their view, arbitrary fees for PIP services. Many challenged the use of the Medicare fee schedule as a basis for the PIP fee schedule. Objectors included physicians and interest groups such as The Association of Trial Lawyers of America, (ATLA-NJ). In addition to specific objections as to the use of Medicare rates, ATLA-NJ also objected to using data from Ingenix to determine the multiplier of the fee schedule, claiming that Ingenix "is a proprietary database that does not disclose the origin of data or method of fee calculation." Others, such as Atlantic Orthopaedic Associates, objected to the limits placed on multiple procedures, noting that injuries from auto accidents result in more complex injuries than those sustained in other ways, making the patient more difficult to treat, and therefore, each individual injury needed to be separately addressed and reimbursed.
During this initial draft review period, the Department received new fee data from a proprietary database of actual PIP reimbursements paid by several automobile insurance carriers during 2004; it was later updated to include 2005 figures. 39 N.J.R. 4126(c) (October 1, 2007). This database was compiled by Consolidated Services Group (CSG), a vendor hired by insurers to evaluate and approve certain treatment and care paths prior to administration of medical services to PIP patients (as required by AICRA). The CSG paid-fee data detailed the average amounts actually paid by the auto insurers to providers for medical services. The payments were divided into payment categories, sorted by CPT code, and included the number of times each medical procedure or service was reimbursed. Ibid. Although in 2005 the information was considered proprietary, in August 2007, the Department received permission to make the data public and did so.
The Department concluded that the data was "sufficient for the development of a comprehensive fee schedule ... [.]" It compared the fees on the draft PIP fee schedule with the fee information from the insurers and found "a high correlation with most of the fees at 130 percent of the MPFS." Ibid. However, the Department also found that certain groups of CPT codes "reflecting specialty services were reimbursed by the auto insurers at much higher levels." Ibid. The Department therefore used the CSG paid-fee data to increase the physicians' fee schedule for those codes "to a level equivalent to what auto insurers paid to providers for these services." Ibid. The Department believed "that using the fees paid to providers by auto insurers for the general fee level and using the RVU system to rank the payments by level of effort is the best way of setting fees that meet the statutory standard." Ibid.
The Department circulated a second pre-proposal draft to interested parties on August 29, 2005. Based on comments from providers concerning the additional administrative costs of treating PIP patients, the Department "raised the percentage to 130 percent of the Medicare fee schedule" for most of the fees. 38 N.J.R. 3437(a) (September 5, 2006). Some of the fees were set at higher or lower percentages of Medicare because the Department realized that the fee set at 130% of the MPFS would not reflect the reasonable and prevailing fees. Ibid. The Department noted that "[i]n setting the current fees as a percentage of Medicare," it was "not taking the position that future updates *779 to the schedule, such as the required biennial review," would use the "same percentages of Medicare." Ibid.
Among other things, the second draft also set fees for surgical services performed in emergency rooms at 150% of the fee schedule, removed trauma doctors in the State's Level 1 and II hospital trauma centers from the fee schedule, increased the daily maximum reimbursement for physical therapy and chiropractic care to $99 instead of $90, removed 120 infrequently used CPT codes and set forth a step-by-step procedure for determining UCR that required consideration of the provider's usual fee and allowed an insurer to reference its prior experience with that provider or national databases of billed fees for that provider's region or zip code to determine a reasonable fee.
At the conclusion of the informal preproposal process, the rules were officially proposed and published in the New Jersey Register on September 5, 2006. 38 N.J.R. 3437(a) (September 5, 2006). The proposal, by in large, set forth the provisions as expressed in the second draft.
In response to the rule proposal, the Department received 305 written comments. 39 N.J.R. 4126(c) (October 1, 2007). Many of the comments echoed the concerns raised about the first proposal. Because the issues on appeal are largely the same as the comments to the proposal and the Department's answers are relevant to a resolution of the issues on appeal, we review the comments and responses.
The Alliance for Quality Healthcare (a coalition of health care providers, including orthopedic surgeons, neurosurgeons, pain specialists and ambulatory surgery centers) and the Orthopedic Surgeons of New Jersey submitted as a comment a report dated December 4, 2006, by Stephen Foreman, Ph.D., J.D., M.P.A., Associate Professor of Economics and Allied Health at Robert Morris University. The report analyzed the proposed PIP medical fee schedules for physicians and ASCs.[3] Notably, Foreman believed that the data from Ingenix was not appropriate to use because Ingenix was wholly owned by United Healthcare, a health insurance firm whose goal was to reduce physician fee reimbursement. Instead, he used the decisions of arbitrators rendered as part of the PIP alternate dispute resolution process as a basis for determining the fee schedule. The physicians' fees in the arbitrations were payment levels at the 75th percentile of "reasonable and prevailing rates," not insurer demanded rates. The report concluded that the proposed fee schedule would pay physicians at rates that were 66.4% of the arbitration award decisions in northern New Jersey, and 63.4% of the arbitration award decisions in southern New Jersey. With regard to ASCs, the report concluded that the proposed fee schedule would pay them between 48% and 52% of current arbitration award levels.
Foreman noted that for some CPT codes, there were few or no arbitration decisions, and therefore, to evaluate those codes, another source of unbiased data was necessary. Foreman found that the Physicians' Fee Reference (PFR) provided *780 by Wasserman Medical Publishers was the "nearest available ... substitute" a source for the "usual, customary and reasonable" fee. Foreman found that "the arbitration award decisions and the PFR payment levels at the 75th percentile are quite consistent."
Foreman then compared the proposed physicians' fee schedule to the physicians' fees in the PFR and to the PFR at the 75th percentile. He concluded that the comparison of the proposed fee schedule CPT code payments to PFR fee schedules showed that the proposed fee schedules would "substantially reduce" physician payment. Therefore, the proposed fee schedule did not meet the requirements of the statute and was inconsistent with the arbitration decisions. Instead, Foreman suggested that the Department base its fee schedule on the PFR and arbitration awards.
The Department did not accept that arbitration decisions were appropriate to create a fee schedule for several reasons. 30 N.J.R. 4126(c) (October 1, 2007). First, it pointed out that there were two different standards for the determination of reimbursement to providers: the fee schedule and, when the fee schedule does not include a particular code, the UCR. Ibid. Because there were never any disputes about the fixed codes, the arbitration awards concerned only the UCRs. Ibid. Second, the arbitrators (also called Dispute Resolution Professionals or DRPs) frequently did not apply the 75th percentile standard and simply accepted whatever bills a provider gave as evidence of the UCR. Ibid. The Department found this procedure unacceptable. Ibid. Third, even if the arbitration decisions could be used as a source for UCR, there were insufficient arbitration decisions to establish a fee schedule. Only 378 of the more than 1,000 codes were the subject of arbitration. Ibid. Fourth, arbitration involved the resolution of a dispute, and a fee schedule based solely on the arbitration award had no way to incorporate the numerous undisputed claims. Ibid. Finally, the arbitrations were filed by a small group of providers, which meant that even if there were 100 arbitration decisions under a particular code, they might only represent ten providers, not 75% of the providers. Ibid.

II.
On appeal, appellants assert that the regulations violate the statutory requirement that the fee schedule must incorporate the reasonable and prevailing fees of 75 % of the practitioners in the region; the Department acted arbitrarily by relying on "secret data;" the Department failed to make the statutorily required biennial inflation adjustments; the regulations improperly rely on "paid" fees; and the determination of "usual, customary and reasonable fees" is subjective and based on unreliable information. Appellants also raise other issues specific to particular details of the regulations.
"It is elementary that an administrative agency derives its power from legislation ...." Rider Ins. Co. v. First Trenton Cos., 354 N.J.Super. 491, 499, 808 A.2d 143 (App.Div.2002). Administrative regulations "cannot alter the terms of a legislative enactment or frustrate the policy embodied in the statute." N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980).
Administrative regulations are entitled to a presumption of validity and reasonableness. In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 329, 807 A.2d 198 (App.Div.2002). We will generally defer to an agency's determination, *781 and our deference is a function of our courts' recognition that "an agency's specialized expertise renders it particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within its area." Id. at 330, 807 A.2d 198. "Particularly in the insurance field, the expertise and judgment of the Commissioner may be allowed great weight." In re Commissioner's Failure to Adopt 861 CPT Codes, supra, 358 N.J.Super. at 149, 817 A.2d 355. We will overturn an administrative determination only if it was arbitrary, capricious, unreasonable or violated express or implied legislative policies. Ibid. The party challenging the agency action bears the burden of overcoming the presumption of validity and reasonableness. Ibid.
With these basic principles in mind, we commence our analysis of appellant's arguments. N.J.S.A. 39:6A-4.6(a) enables the Department to promulgate a physicians' fee schedule to "incorporate the reasonable and prevailing fees of 75% of the practitioners within the region." Appellants contend that neither the new physicians' fee schedule nor the ASC facility fee schedule meets the statutory mandate that the fees reflect the reasonable and prevailing rates of 75% of practitioners.
To support their position, appellants review several of the specific proposed reimbursements to demonstrate how, under these schedules, the providers of these services would not be reimbursed their reasonable and prevailing fee. As an example, appellants cite generally low reimbursements for neurosurgeons, specifically for a cervical laminectomy and fusion and orthopedic surgeons, as well as emergency surgical care. Unfortunately, these are generalized complaints, and our consideration of the issue is hampered by the lack of adequate documentation to establish the premise. Although one neurosurgeon reported actual figures, the nonspecific complaint that the proposed reimbursement rates do not reflect reasonable and prevailing fees is inadequate to sustain appellant's position.
In Bergen Pines County Hospital v. Department of Human Services, 96 N.J. 456, 474, 476 A.2d 784 (1984), the Court explained that "[t]he basic purpose of establishing agencies to consider and promulgate rules is to delegate the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources, and expertise to understand and solve those specialized problems." The rulemaking procedures, including the notice requirements and requests for public comments "are designed to take advantage of the agencies' resources and expertise." Ibid.
The agency is particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that such a notice of proposed rulemaking would invite.
To permit a party in court to raise objections to a rule and to submit evidence concerning those objections that it failed to raise before the administrative agency at the appropriate time would be to undermine the very purpose of administrative agencies. In addition, it would force courts to review potentially overwhelming reams of technical data and to resolve from scratch issues as to which it does not have particular expertise. Finally, it would permit a party who fostered an inadequate rulemaking record by his own admission to take advantage of the inadequacy of the factual record in order to secure de novo review of the wisdom of the rule.
[Ibid.]
Although the reporters responding in their comments took the opportunity to address the proposed rules, they did not *782 provide any documentation to support their claims. Given the lack of documentation and being mindful that the burden remains with appellants challenging an agency determination, we are unable to conclude that PIP reimbursement rates do not reflect the reasonable and prevailing fees of 75% of the providers in a region.[4] Nevertheless, appellants still maintain that because the Department failed to explain its methodology and used unreliable data in setting its rates, the Department has not shown that the physicians' fee schedule was set at the statutorily required rate.
Appellants correctly anticipate the Department's claim that the "reasonable and prevailing rates" were derived from reliable data. Appellants respond that the data upon which the fee schedule was based was not reliable or appropriate.
There were several sources of data relied upon by the Department, and appellants argue that two of themthe Ingenix data and the CSG datawere unreliable and therefore should not have been used. They also argue that for several reasons it was inappropriate to use the other main source of datathe Medicare fee schedule.
Specifically, appellants maintain that the Ingenix database should not have been used because Ingenix is wholly owned by an insurer and uses proprietary data. Appellants argue that using the proprietary fee data was "plainly improper and rendered Respondent's action arbitrary, since its information and methodology in setting the fee schedule cannot be tested for accuracy."
As support for this position, appellants cite to Medical Ass'n of Ga. v. Blue Cross and Blue Shield of Ga., 244 Ga.App. 801, 536 S.E.2d 184 (2000), cert. denied, 2001 Ga. LEXIS at *3 (Ga. Jan. 5, 2001). In that case, physicians contracted with the insurer to be paid their "usual, customary and reasonable fees" for services. Id. at 185. The insurer changed the meaning of the "usual, customary and reasonable" fee from what doctors usually charged for a particular service to the fee that doctors in a given geographic area usually received for a particular service. Ibid. The physicians argued that because the insurer refused to give the physicians either a fee schedule or the precise methodology that it used to determine the usual, customary and reasonable fee, the new fee schedule was improper; the court agreed. Id. at 186. The court explained that without the fee information, there was "no way for doctors to calculate for themselves whether they have been fully paid for a particular service under the plan." Ibid. Further, "the doctors never agreed to allow [the insurer] to keep its fee schedule and methods for determining fees [a] secret." Ibid. "Such information is critical to the doctors so that they can ensure that [the insurer] is fulfilling its obligations under the contracts." Ibid.
Medical Association of Georgia is distinguishable. First, the arrangement between the doctors and the insurer was a consensual contract. As the court noted, the physicians never agreed, under the contract, to keep the fee information a secret. Here, the arrangement between the physicians and the insurers is not one of consensual agreement, but rather one forged by statute and regulation. Second, *783 the enabling statute here, N.J.S.A. 39:6A-4.6, specifically permits the Commissioner to "contract with a proprietary purveyor of fee schedules for the maintenance of the fee schedule ...." The Department is empowered to use proprietary data. Finally, the Georgia doctors did not receive a fee schedule or methodology. Here, the rules mandated both the fee schedule and the statutory methodology, including the use of proprietary purveyors.
To further support their argument that relying on the Ingenix database was improper, appellants cite Wachtel v. Guardian Life Ins. Co., 223 F.R.D. 196 (D.N.J. 2004), vacated and remanded on other grounds, 453 F.3d 179 (2006), in which criticisms of Ingenix were discussed. Wachtel involved the issue of class certification. Id. at 198. While criticisms of Ingenix were identified, the court did not address these issues in deciding the class certification issue. Id. at 201 n. 7.
More relevant is appellant's reliance on McCoy v. Health Net, Inc., 569 F.Supp.2d 448 (D.N.J.2008).[5] In McCoy, the judge explored the intricacies of the Ingenix databases for determining the "usual, customary and reasonable" (UCR) charges of out-of-network claims in connection with a fairness hearing to determine whether to approve a class action settlement in a suit against a health care insurer. In the proposed settlement, the insurer agreed to stop using Ingenix databases for determining UCR for out-of-network claims. The judge had to determine the importance and value of that change of business practice to the class in order to decide whether the settlement should be approved. Id. at 463-64.
The judge heard testimony from an expert "about the methods used by Ingenix to create its commercial databases ...." Id. at 463-64. Specifically, the expert analyzed the two Ingenix databases that were used to calculate UCR: the Prevailing Healthcare Charge System database (PHCS database) and the MDR/Medicode database. Id. at 464. After hearing from the expert, the judge concluded that the Ingenix databases suffered from flaws in three broad categories: a) data collection and sampling; b) database creation and editing; and c) data analysis. Id. at 464-68. The judge found that the Ingenix databases, at least as they were utilized to determine UCR rates, were unreliable.
The Department asserts that the databases criticized in McCoy were not the databases utilized here to set the physician's fee schedules. As the Department correctly notes, "[t]he two McCoy databases were utilized to determine whether the charges of `out-of-network' providers were usual, customary and reasonable .... [T]he Department created a PIP fee schedule based upon paid, not billed or charged, fees." To set the physicians' fee schedule, the Department used Ingenix's "`allowed fee'" database, which contained data on the reimbursement amounts actually paid by insurers and accepted by providers. The Department also correctly observes that McCoy has no effect here because the Department relied on the Ingenix database only as one source of information in reaching its physicians' fee rate determinations. The McCoy court reviewed databases of fees submitted by physicians as their UCR charges; the Department's data showed the actual amounts paid by providers, not what was billed.[6] In our view, the utility of McCoy as it applies to the actual amounts paid is problematic.
*784 Appellants further claim that the Department admitted that the Ingenix database was suspect because: 1) Ingenix could not explain why its fees were higher in southern New Jersey than in northern New Jersey, and 2) it did not include sufficient data about many procedures commonly performed in treating auto injuries. The Department did indeed make these concessions. 39 N.J.R. 4126(c) (October 1, 2007). The Department claims, without citation to authority or the record, that "the South vs. North anomalies in the 2000 `allowed fee' data obtained from Ingenix were resolved in the 2002 update," thus, the Ingenix database was reliable. The database did not include sufficient data about many procedures commonly performed in treating auto injuries because the procedures were not commonly found in the claims paid by the health insurers who contributed to the Ingenix database. 39 N.J.R. 4126(c) (October 1, 2007).
Although the Department admitted these shortcomings, it emphasized that they were not fatal flaws in the data and that the Ingenix database was just one of several sources of information that it relied upon in formulating the schedules. Ibid. Even if the database did not include sufficient data about certain auto injuries, that does not detract from the reliability of the data the Department did have. We are satisfied that absent total reliance on the Ingenix database, we will not overturn the regulations based on deficiencies in one data resource. The Department utilized other data in promulgating its rules, and we reject the argument that the databases were so flawed as to prove fatal to the rules.
Appellants next argue that data provided by CSG, a PIP claim billing service utilized by 28.64% of the auto market insurers in New Jersey, should not have been used because the spreadsheet it provided stated only that it contained 2005 blended auto data, but did not identify any insurer by name or identify how many insurers contributed to the compilation. Therefore, claim appellants, the source of the data was a "mystery," and there was "no indicia of accuracy."
The Department does not dispute that the spreadsheet fails to name the insurers involved, but asserts that "the standard established by N.J.S.A. 39:6A-4.6(a) is not easily achieved because there is no existing database of the reasonable and prevailing fees paid to reimburse 75 percent of the medical practitioners in any region of the State." It also acknowledges that data on paid fees by auto insurers and individual health care plans is difficult to obtain given that the information is often proprietary. Notably, in the adoption comments the Medical Society of New Jersey (an appellant here) undertook to make its own determination of what physicians are reimbursed for procedures covered under PIP and "encountered difficulties in establishing a credible database of fees." 39 N.J.R. 4126(c) (October 1, 2007). The Medical Society found that physicians would not share with each other information about the fees they charged "because of concerns about violating antitrust statutes." Ibid. Further, the Department properly rejected suggestions that it use physician surveys or arbitration awards. Ultimately, the Department relied on the data it could obtain.
The Department represented that the information on the spreadsheet from CSG was complied from "several insurers" who represented "more than 25 percent of the New Jersey auto insurance market." Given the difficulty, acknowledged by both the Department and appellants, in finding credible sources of fee information, the Department's decision to use actual PIP *785 data from insurers is appropriate even though the names of the insurers were not revealed. The enabling statute allowed the Department to use a proprietary purveyor of fee data, which by its nature would include data without an identified source. The data from the CSG insurers presented no more "mystery" than data supplied by a proprietary purveyor of fee schedules. Moreover, the Department released an abbreviated spreadsheet with many of the actual figures received by CSG, so even if the exact insurers were not revealed, the actual data relied upon was transparent.
We reject appellants further arguments that the methodology used for the spreadsheet was inadequately explained and factually unsupported. The initial spreadsheet was eighty-one pages and included 1,000 CPT codes. The spreadsheet released to appellants was fifty pages and included 416 CPT codes. The Department contended that the smaller spreadsheet was simply a "subset" of the eighty-one page spreadsheet. We deem this of no moment. Any CPT codes that were not included on the fee schedule would still be paid according to the usual, customary and reasonable charges for that service.
We accept the same explanation for omitted codes. As the Department explained, it used the CSG data to compare or "proof[]" other data that it had. If there was no CSG data, it obviously could not compare the fees. Nevertheless, the Department "still had multiple other data sources to support the promulgation." When a CPT code did not have any specific data to support the amount of the fee, the Department determined a reasonable fee approximation by reference to the surrounding CPT code families, a logical methodology. Although the CSG data might not have provided data on every CPT code, the factual basis for the codes it did provide is strong. The lack of data on every possible code does not undermine the reliability of the CSG paid fee data that it did have. Appellants have presented no compelling argument that the data supplied by CSG was not reputable and worthy of consultation.
Appellants next maintain that it was erroneous to base the PIP fee schedule on a percentage of Medicare because the Department failed to establish that Medicare reimbursement rates bore any relationship to the "reasonable and prevailing fees" of 75% of the practitioners in the region. They complain that Medicare rates are "woefully" less than the "`reasonable and prevailing fees'" of PIP service providers because Medicare rates are limited by federal budget constraints and are part of a program providing subsidized care for the elderly. Additionally, treatment of PIP patients is more expensive than treatment of typical Medicare patients based, in part, on higher administrative costs for PIP claims. And, significantly, the Department never adequately explained or documented how and why Medicare payment rates were "a reliable barometer to determine" the reasonable and prevailing fees of 75% of the practitioners.
Contrary to appellants' contentions, the Department fully and convincingly explained why it relied upon the Medicare schedules. It noted that the Medicare schedule was "comprehensive" and "resource based." 38 N.J.R. 3437(a) (September 5, 2006). The methodology was described in detail. The Centers for Medicare and Medicaid Services, with input from the provider community, calculated a "relative value unit" (RVU) for the physician's work, practice expenses and malpractice premium expense for each CPT code. Ibid. The RVUs are then adjusted by a geographical practice cost *786 index that reflects those costs in a specific region. Ibid. The result was then multiplied by a dollar amount called the Medicare conversion factor to produce the fees for each Medicare region. Ibid.
In the final rules, the Department stated that it compared the Medicare fee schedule to the actual fees paid by auto insurers in 2005, as represented by CSG data. 39 N.J.R. 4126(c) (October 1, 2007). It found that for a majority of the CPT codes, 130% of the Medicare fee schedule "corresponded well to the 75th percentile fees paid by auto insurers." Ibid. The Department also noted that the actual fees paid by auto insurers were higher, and in some cases, significantly higher, than reimbursements from other insurers. Ibid.
The Department also addressed the concern that the CSG data showed that treatment of PIP patients was more complex than Medicare patients. 39 N.J.R. 4126(c) (October 1, 2007). It noted that the CPT codes had been developed by the American Medical Association to "simplify the reporting of treatment by describing the services performed by physicians and other health care providers." Ibid. The CPT manual contained modifiers for some services or procedures that needed to be altered due to some specific circumstance. Ibid. "The CPT manual does not have separate codes based on what caused the injury nor are there any modifiers that recognize that there is any change in the service or procedure performed due to the cause of the injury." Ibid. Based on that, the Department concluded that there was no difference in the treatment provided to accident victims from that of other patients. Ibid.
The Department's explanation demonstrates that setting the fee schedule at 130% of the Medicare rates was not arbitrary. The Department found that actual payments made by insurers for the same procedures (at the 75th percentile) equaled 130% of the Medicare fee schedule in most instances. In some specialty cases, the Department increased the fee by more than 130%. By comparing the actual amounts insurers paid with the Medicare data, the Department had a sound basis for setting the fees. The comprehensive Medicare fee schedule was simply a starting point for the fees.
The Department explained that it used these three databases, in addition to the New York State Workers' Compensation and No Fault Fee Schedule, to develop the PIP fee schedule. 38 N.J.R. 3437(a) (September 5, 2006). It explained in as much detail as possible the foundation of each database, why it used each one and how the databases were "proofed" against each other to determine a PIP reimbursement figure. Nevertheless, the Department concedes that none of the databases is perfect and, in some respects, not comprehensive. The fixing of the rates is not an exact science, but the record supports a finding that the databases were reliable sources of information upon which to base the physicians' fee schedule.
Our inquiry must be whether the Department was able to use the databases to ensure that the physicians' fee schedule satisfied the statutory mandate that the fees represent the reasonable and prevailing fees of 75% of the practitioners in the region.
Appellants' arguments concerning the application of the data are closely linked to the reliability of the data. In general, they argue that even if this data was properly used, the fees set in the physicians' fee and ASC fee schedule do not represent the reasonable and prevailing fees of 75% of the practitioners in the region.
With regard to the CSG spreadsheet, appellants argue that for the CPT codes *787 included in the spreadsheet, the spreadsheet did not demonstrate that the fee schedule incorporated the reasonable and prevailing fees of 75% of the practitioners for those codes because the codes show averages of the paid fees from the insurers, and those averages had no identifiable relationship to the fees in the schedule. In fact, appellants assert, "the average of paid fees ... from these `sources' were [sic] substantially higher than the amount of fees in the adopted fee schedule for those codes." In support of its argument, appellants cite a number of examples where the amounts paid by insurers significantly exceeded the PIP reimbursement rate.
The Department maintains that it "examined the fee sources in detail to identify any anomalies, outliers, or errors," looked for procedures or services where reimbursement rates appeared to be "unreasonable" and adjusted them accordingly. The Department maintains that it properly exercised its discretion and did not act arbitrarily or capriciously. For each extreme example cited by appellants, the Department explained them and the reasons behind those adjustments. The adjustments support the Department's representation that it reviewed each of the codes individually for anomalies or errors. The majority of the codes were set at 130% of the Medicare rate. For 183 CPT codes, the Department adjusted the rates higher than 130% of Medicare. While some of these codes were adjusted to 150% of Medicare, many were adopted at 350% of Medicare, several at 450% of Medicare, some at 600% of Medicare and even one at 800% of Medicare. Appellants' arguments about a few select procedures being reimbursed at less than the Medicare rate does not convince us that the entire procedure is defective.
The Department maintains that all of the fees on the physicians' fee schedule are higher than the fees on the MPFS, the state workers' compensation schedule and the fees paid by health insurers according to Ingenix. 39 N.J.R. 4126(c) (October 1, 2007). Appellants' have not made any convincing argument that the rates set in the physicians' fee schedule did not meet the statutory standard.
Appellants also argue that the rates for ambulatory surgery centers (ASCs), which were set for the first time in this schedule, were, at 300% of Medicare, far below the reasonable and prevailing fees for ASC services in New Jersey. The Department, appellants allege provided no data to justify the amounts in the new fee schedule.
The Department acknowledged the difficulty in obtaining data regarding ASC facilities, given that these facilities were "a relatively new phenomenon." 39 N.J.R. 4139 (October 1, 2007). It also noted that the field had been unregulated. As a result, "exorbitant fees" had been charged, and fraud had been a concern. Ibid. Further, fees charged for the same service were widely divergent. Ibid.
Because Ingenix did not maintain a database of fees for ASCs, the Department examined the Medicare schedule for ASC facility fees that had been recently set by CMS. 38 N.J.R. 3437(a) (September 5, 2006). The Department explained:
Medicare has recently set facility fees for ASCs at a prospectively determined rate that approximates the costs incurred by ASCs in providing services. The rates are determined by conducting a survey of the audited costs of a sample of ASCs every five years. The rates are adjusted for inflation during the years when the survey is not conducted. The Department is using the Medicare system whereby procedures designated by *788 CPT codes that are performed in ASCs are put into nine fee groups.
[Ibid.]
The services in these groups were assigned dollar amounts set at 300% of Medicare. 39 N.J.R. 4126(c) (October 1, 2007). In setting this rate, the Department also consulted the PIP paid fee data from CSG. The 300% rate was more than double the original proposal of 120%.
The Department used the Medicare rates as a basis for setting the ASC reimbursement rates. With the lack of other data regarding ASCs, and much of the available data being contradictory, this approach is reasonable. Appellants have not suggested anything indicating that the rates set were inconsistent with the reasonable and prevailing fees charged by ASCs.
We have noted that the fixing of these rates is not an exact science and when confronted with inadequate data, new methodologies of providing treatment and the various other imponderables that arise in the process, the Department made considered and informed judgments. Certainly, many elements of the process can be criticized, but ultimately, the entire scope of the process must be assessed. We conclude that appellants have not met their burden of showing that the methodology for setting the PIP reimbursement rates was flawed or that the rates set violated the statutory mandate to represent the reasonable and prevailing rates of 75% of the practitioners in the area.
We briefly address appellants argument that the Department's contradictory statements demonstrate that its actions were arbitrary and unsupported. The arguments are without merit. The Department did rely on Medicare rates as a starting point for its calculations but did not link the PIP rates to Medicare rates. If the Medicare rates change, that will not implicate or cause a change in the PIP rates.
Likewise, the seemingly contradictory statements regarding the use of PIP fee data to set the fee schedule are without contradiction. The Department addressed the issue in 38 N.J.R. 3437(a) (September 5, 2006), which stated in part, "[b]ased upon the information submitted by providers through the informal pre-proposal process and paid fee data provided by insurers, a number of fees have been set at higher or lower percentages of Medicare." (Emphasis added). The Department mentioned the data again at 39 N.J.R. 4126(c) (October 1, 2007).
We similarly reject appellants' next argument that the Department failed to make the statutorily required biennial adjustments for inflation, and as such, the rules fail to set the reimbursement rates at the 75% rate required.
The Department addressed this issue in response to the same criticism in the comments:
The Department did not provide any inflation analysis in the proposed amendment because it was not adjusting an existing fee schedule for inflation but rather establishing a new fee schedule. However, the Department recognizes that the physicians' fee schedule is based primarily on data from 2005, although it reflects the two percent increase in the MPFS in 2006. The Department intends to propose an inflationary adjustments to the physicians' fee schedule in the near future. The Department has not reviewed all the fee schedules biennially as required by statute because the medical fee schedule and the three other fee schedules adopted in 2001 were subject to litigation until 2003. Since then, the Department has been developing the proposed *789 comprehensive physicians['] fee schedule.
[39 N.J.R. 4126(c) (October 1, 2007).]
Although the Department acknowledged that it had not made the inflation adjustment, this fee schedule did not use the previous schedule as a basis, so the lack of adjustment for inflation of the previous fee schedule is of no moment. This new fee schedule was based primarily on 2005 data, but a 2006 Medicare adjustment was included. The rates were supposed to take effect in 2007, but because of appellants' challenge resulting in this litigation, they did not. This is an unfortunate, but unavoidable consequence of litigation. Nevertheless, at the time they were set, the rates were based on current data. The Department stated that it intended to propose a change in 2008, to reflect inflation through 2007. 39 N.J.R. 4126(c) (October 1, 2007). Appellants have not shown that the Department's failure to make the biennial adjustment in the past has any bearing on the accuracy of the present schedule.
Appellants next assert that the Department's "decision to derive the fee schedule from `paid fees' rather than billed fees, is unlawful based on the clear statutory language and well-established principles of statutory construction."
The issue of whether the Department could rely on paid fees as opposed to billed fees was squarely addressed in Coalition III, supra, 358 N.J.Super. at 123, 817 A.2d 347. We phrased the issue this way:
Appellants contend that, by basing ... [the physicians' fee schedule] on paid fees rather than billed fees, the Department... exceeded the scope of its legislative authority and acted contrary to legislative intent. The Department responds that it acted within its ample discretion to establish fee schedules.... The charged-fee versus paid-fee issue must be resolved at some point. It is better resolved now than later.
[Id. at 126, 817 A.2d 347.]
The appellants in Coalition III argued, as appellants do here, that the "`reasonable and prevailing fees of 75% of the practitioners within the region' necessarily refers to billed fees." Id. at 127, 817 A.2d 347. We noted that the purpose of the statute was to contain automobile insurance costs "while providing a fair level of reimbursement for services based on what providers received in the market." Id. at 128, 817 A.2d 347 (quoting 32 N.J.R. 4332(a), 4333 (December 18, 2000)). We further noted the change in the medical field; providers frequently accept less in payment than they bill due to managed care contracts. Ibid. We found that "paid fees have diverged significantly from billed fees, making paid fees a much more accurate measure of `reasonable and prevailing fees.'" Id. at 127-28, 817 A.2d 347. We determined that basing the fee schedule on the paid fees was not arbitrary or capricious and was within the discretion of the Department. Id. at 128, 131, 817 A.2d 347.
Appellants here do not dispute the holding of Coalition III, but say, "[s]imply put, the decision was wrongly decided and should not be followed." We disagree and see no reason to revisit the issue. In Coalition III, we found that the Department's use of "paid fees" was an acceptable interpretation of the statute and we adopt the reasoning of our colleagues in rejecting appellants' argument.
Appellants next argue that the new rules "improperly permit" the UCR fees to be "based on subjective determinations and unreliable sources." The Department and intervenors disagree and maintain that the method for determining the UCR was within the Commissioner's broad discretionary power. Prior to the *790 amendment at issue here, fees that were not on the physicians' fee schedule were paid at the provider's "usual, customary and reasonable fee." N.J.A.C. 11:3-29.4(e). The amendment, N.J.A.C. 11:3-29.4(e)(1), states:
For the purposes of this subchapter, determination of the usual, reasonable and customary fee means that the provider submits to the insurer his or her usual and customary fee. The insurer determines the reasonableness of the provider's fee by comparison of its experience with that provider and with other providers in the region. The insurer may use national databases of fees, such as those published by Ingenix (www. ingenixonline.com) or Wasserman (http://www.medfees.com/), for example, to determine the reasonableness of fees for the provider's geographic region or zip code.
The Department felt that this amendment was necessary because during arbitrations over the UCRs, the arbitrators
have interpreted case law to conclude that UCR is determined by simply looking at whatever bills a provider chooses to produce as evidence of his or her usual and customary fee. The attempts of insurers to show that the provider's fee is not reasonable based on national fee databases of billed fees, such as Ingenix, have been rejected by the [arbitrators] on the basis that there is no documentation on how Ingenix establishes its fee database.
The Department believes that the [arbitrators'] method of determining the UCR simply by using the fees on bills selected by the provider is not acceptable. The current proposal establishes a more detailed methodology for determining UCR that includes use of national billed fee databases such as Ingenix and Wasserman to demonstrate the reasonableness of the fees submitted by the provider.
[39 N.J.R. 4126(c) (October 1, 2007).]
Appellants argue that this amendment was improper for several reasons. First, they reiterate the objections they raised earlier as to Ingenix and raise two additional arguments. They assert that it is a national database, but the statute requires the fees be determined with respect to the region. This objection is without merit. While the national databases might include data for other parts of the country, the regulation specifically states that the data taken from Ingenix can only be based on the provider's "geographic region or zip code." N.J.A.C. 11:3-29.4(e)(1).
The second argument relies on the findings of the federal court in McCoy as to problems with the specific database involved in that litigation. We are concerned about the reliability of the Ingenix database referred to in N.J.A.C. 11:3-29.4(e)(1), but it is not clear to us that this is the same database condemned in McCoy. Also, there is a more significant distinction. The rule provides that the insurer "may" rely on the Ingenix database; it does not mandate such reliance. Moreover, the cited databases are examples of available resources rather than mandated references.
We are left with at least three alternatives. We can affirm N.J.A.C. 11:3-29.4(e)(1), as stated and allow the Department to make further inquiry into the reliability of the questioned database; we can exercise our jurisdiction and excise the offending portion of the regulation that calls for reliance on the Ingenix database; or we can affirm this rule and enjoin any reliance on the Ingenix database pending further review by the Department as to the reliability of the database.
*791 The first alternative would possibly permit the use of a database that is flawed; the second alternative might eliminate a valid, but untested, resource for the use of the insurer; the third alternative will allow the Department to apply its expertise in assessing the bona fides of the questioned database and allow the remaining rules to be implemented. Accordingly, we will adopt the third alternative and enjoin the use of that provision of N.J.A.C. 11:3-29.4(e)(1), that permits, even by example, the use of the Ingenix database.[7]
Appellants next challenge the part of the rule, which would allow insurers to determine the reasonableness of the fees "by comparison of its experience with that provider and with other providers in the region." Appellants argue that an insurer's interpretation of its experience with a provider or other unidentified providers "in no way satisfies the Statute's requirement to pay `the reasonable and prevailing fees of 75% of the practitioners within the region' for those services." The Department maintains that the 75% standard does not apply to the UCRs, and applies only to the PIP fee schedule. As support, the Department points to N.J.S.A. 39:6A-4.6(a), which states that the "fee schedules" "shall incorporate the reasonable and prevailing fees of 75% of the practitioners within the region." The fees not listed on the fee schedule are paid at the UCR, which is not subject to the 75% standard. N.J.A.C. 11:3-29.4(e); 39 N.J.R. 4126(c) (October 1, 2007). The Department's interpretation is correct and requires no additional comment.
Finally, appellants argue that the amendment cannot be sustained because it leaves payment determinations to the discretion of the insurers, with no accountability or redress for aggrieved providers, in violation of Cobo, supra, 293 N.J.Super. at 386, 680 A.2d 1103, which requires that "the health care provider will set its own customary fee, not the insurer ...." Appellants argue that the proper methodology for determining the UCR fee is for the provider to determine his or her UCR fee, while the insurer strives to ensure that the provider's UCR fee is billed. It is improper for the insurer to make the final payment determination based on its own assessment of UCR, with no meaningful accountability.
The amendment does not violate Cobo. In addressing the application of N.J.A.C. 11:3-29.4, we noted a comment that "raised the question of whether insurers might construe the regulatory language as allowing them to establish their own reasonable and appropriate fees." Cobo, supra, 293 N.J.Super. at 386, 680 A.2d 1103. The Commissioner responded:
The provider, in submitting the billings, makes the initial determination as to what his or her usual, customary and reasonable fee is. It is incumbent on the insurer, based on its experience with the particular provider or other providers in the region, to determine whether, in fact, the usual, customary and reasonable fee has been billed. The effectiveness of the medical fee schedules in the cost of auto insurance in New Jersey is dependent upon adherence by insurers to this review process.
[Ibid. (quoting 24 N.J.R. 1348 (April 6, 1992)).]
We continued, "[t]hus, the scheme envisions that the health care provider will set its own customary fee, not the insurer or the insurer's auditor. But at the same time, the insurer has a mandate to review *792 the provider's bills to ensure that it has billed at its customary and reasonable rate." Cobo, supra, 293 N.J.Super. at 386, 680 A.2d 1103.
The proposed rule conforms with Cobo. Under N.J.A.C. 11:3-29.4(e)(1), the provider submits his or her usual and customary fee. The insurer then determines the reasonableness of the fee. That is no different than the procedure in Cobo. The new provision allows the insurer to consult with a national database for help in determining the reasonableness of the fee. Such a procedure will provide more protection against arbitrary determinations to the providers. Nevertheless, if a provider disagrees with the insurer's determination, the provider has the option of filing for arbitration. N.J.S.A. 39:6A-5.1. There is accountability and meaningful review.
Finally, we have considered the remaining arguments raised by appellants. We conclude that they are without merit and do not require further discussion. R. 2:11-3(e)(1)(E).
The use of the Ingenix database in determining the "usual, customary and reasonable fees" as required by N.J.A.C. 11:3-29.4(e)(1), is enjoined pending further review by the Department; in all other respects, the decision of the Commissioner adopting the rules, regulations and amendments to N.J.A.C. 11:3-29.1.4 is affirmed.
NOTES
[1] For ease of reference, we refer to the rules, regulations and fee schedule collectively as either "the rules" or "the regulations."
[2] In the Medicaid context, DRGs are described as "`specified diagnostic categories for which hospitals receive a predetermined fixed amount for inpatient services.'" In re Commissioner's Failure to Adopt 861 CPT Codes and to Promulgate Hosp. & Dental Fee Schedules, 358 N.J.Super. 135, 140, 817 A.2d 355 (App.Div.2003) (quoting Atl. City Med. Ctr. v. Squarrell, 349 N.J.Super. 16, 22, 793 A.2d 10 (App.Div.2002)).
[3] In its brief, intervenors discuss in detail the report of Zachary Dyckman, Ph.D., which was prepared on behalf of New Jersey Manufacturer's Insurance Company. However, the Dyckman report was submitted in May 2007, five months after the deadline to submit comments to the rule proposal, and it was not included in the comments considered by the Department. 39 N.J.R. 4126(c) (October 1, 2007). Therefore, his report was not part of the record below and will not be considered on appeal. R. 2:5-4(a); Hisenaj v. Kuehner, 194 N.J. 6, 18, 942 A.2d 769 (2008).
[4] Although we are sustaining the rate scheme as a whole, we do not foreclose an "as-applied" challenge being presented administratively before the Department to particular rates or clusters of rates, as experience with the new rates develops. We also trust that the Department will monitor the appropriateness of a particular rate for a particular procedure with the benefit of that experience, and that the Department will be open to making discrete judgments to the rates as experience may warrant.
[5] McCoy was a part of the Wachtel litigation.
[6] The impact of McCoy as it relates to CPT codes that were not part of the physician's fee schedule is discussed, infra.
[7] In this regard, we do not retain jurisdiction and any determination made by the Department shall be subject to any appellate remedy an aggrieved party may pursue.