FASCIALE, J.A.D.
*932 *393 This appeal focuses on the 2016 re-adoption of N.J.A.C. 17:1, with amendments (the Re-adoption), promulgated by the Department of the Treasury, Division of Pension and Benefits (Division). The Re-adoption governs the disability retirement application process for various State public retirement systems. In challenging amended N.J.A.C. 17:1-6.4, N.J.A.C. 17:1-7.5, and N.J.A.C. 17:1-7.10, the New Jersey Education Association (NJEA) argues *394 the Division exceeded its statutory authority and acted arbitrarily. The NJEA urges us to invalidate the challenged regulations.
Understanding that administrative regulations are entitled to a presumption of validity and reasonableness, and giving the Division wide latitude to achieve its legislatively assigned tasks, we hold that most of the challenged regulations comport with the terms and objectives of the governing statutes. That is, the Division mainly acted consistently with the enabling statutes, which it reasonably interpreted. Yet, there are a few instances where that is not the case.
So we uphold N.J.A.C. 17:1-6.4 (the separation from service rule);[1] N.J.A.C. 17:1-7.10(a)(1) (part of the documentation amendment); N.J.A.C. 17:1-7.10(e) (the certification amendment); N.J.A.C. 17:1-7.10(f) (the one retirement application amendment); N.J.A.C. 17:1-7.10(j) (the notification amendment); and N.J.A.C. 17:1-7.5(c) and (c)(1) (part of the subsequent independent medical examination (IME) amendment). But we invalidate N.J.A.C. 17:1-7.5(c)(2) through (c)(4)-which require applicants to pay for subsequent IMEs-and N.J.A.C. 17:1-7.10(a)(2)-which requires applicants to pay for addenda to IMEs.
In general, the primary practical effect of our holding-as to the separation of service rule-maintains the longstanding principle that eligibility for disability retirement benefits requires members to make a prima facie showing that they cannot work due to a disability. To that end, voluntary or involuntary termination of employment, for non-disability reasons, generally deems a member ineligible for disability benefits. Such a holding comports with the existing overall framework of the enabling, eligibility, and rehabilitation statutes, and policies applicable to the various State *395 public retirement systems. To hold otherwise would require us to re-write the text of multiple statutes, which has never been the role of the judiciary.
I.
A familiar standard of review guides our holding and analysis. "Administrative regulations are entitled to a presumption of validity and reasonableness." In re Adoption of N.J.A.C. 11:3-29, 410 N.J. Super. 6, 24, 979 A.2d 770 (App. Div. 2009). "The party challenging the agency action bears the burden of overcoming" this presumption. Id. at 25, 979 A.2d 770.
*933 Courts will "overturn an administrative determination only if it was arbitrary, capricious, unreasonable or violated express or implied legislative policies." Id. at 24-25, 979 A.2d 770. Administrative agencies have wide discretion to decide "how best to approach legislatively assigned administrative tasks." In re Failure by the Dep't of Banking & Ins., 336 N.J. Super. 253, 262, 764 A.2d 494 (App. Div. 2001). It has been a longstanding principle that "the grant of authority to an administrative agency is to be liberally construed ... to enable the agency to accomplish its statutory responsibilities." N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978). As a result, "courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." Ibid.
Nonetheless, "[a]n administrative regulation 'must be within the fair contemplation of the delegation of the enabling statute.' " Id. at 561-62, 384 A.2d 795 (quoting S. Jersey Airways, Inc. v. Nat'l Bank of Secaucus, 108 N.J. Super. 369, 383, 261 A.2d 399 (App. Div. 1970) ). We usually apply substantial deference to a regulation promulgated by an agency. But the application of "substantial deference" afforded to regulations is only available if they are "consistent with the governing statutes' terms and objectives." In re Adoption of Amendments to N.J.A.C. 6:28-2.10, 3.6 & 4.3, 305 N.J. Super. 389, 401, 702 A.2d 838 (App. Div. 1997).
*396 To determine if an agency had the requisite authority to issue a regulation, courts strive "to determine the intent of the Legislature." Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 26, 575 A.2d 1348 (1990). We begin with the statutory language, the best indicator of legislative intent. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). Here, the text is not contained in only one statute, but appears in multiple statutes related to several State public retirement systems.
Our analysis, however, of whether the Legislature authorized the challenged regulations is not limited to a plain reading of one provision in a large statutory scheme. "[A] reviewing court 'may consider the entire enabling legislation ... to ascertain if there is in fact sufficient underlying authority [for a regulation].' " In re N.J.A.C. 7:1B-1.1, 431 N.J. Super. 100, 119, 67 A.3d 621 (App. Div. 2013) (quoting Long, 75 N.J. at 561, 384 A.2d 795 ). In a similar vein-like we have done here-courts "may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." Long, 75 N.J. at 562, 384 A.2d 795 ; accord N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549, 49 A.3d 860 (2012). Courts defer to the interpretation of legislation by the administrative agency to whom its enforcement is entrusted, but only if that interpretation "is not plainly unreasonable." Merin v. Maglaki, 126 N.J. 430, 436-37, 599 A.2d 1256 (1992) ; accord Matturri v. Bd. of Trs. of the Judicial Ret. Sys., 173 N.J. 368, 382, 802 A.2d 496 (2002).
II.
The Division administers the Police and Firemen's Retirement System (PFRS); the Public Employees' Retirement System (PERS); the Teachers' Pension and Annuity Fund (TPAF); the State Police Retirement System (SPRS); the Consolidated Police and Firemen's Pension Fund (CPFPF); the Judicial Retirement System (JRS); and the Prison Officers' Pension Fund (POPF).See *397 Burgos v. State, 222 N.J. 175, 184, 118 A.3d 270 (2015). The Re-adoption deals with the Division's administration *934 of these State retirement systems, and the challenged regulations generally address disability retirement eligibility and related applications.
Disability retirement applicants generally apply for ordinary or accidental disability retirement benefits. There are multiple statutes that permit these benefits. For example, N.J.S.A. 43:16A-6 to -7 (PFRS); N.J.S.A. 43:15A-42 to -46 (PERS); N.J.S.A. 18A:66-39 to -42 (TPAF); N.J.S.A. 53:5A-9 to -10 (SPRS); N.J.S.A. 43:16-2 (CPFPF) ; N.J.S.A. 43:6A-12 (JRS) ; and N.J.S.A. 43:7-12 (POPF). The question is whether the challenged regulations- N.J.A.C. 17:1-6.4, N.J.A.C. 17:1-7.5, and N.J.A.C. 17:1-7.10 -are inconsistent with the legislative intent expressed in the various enabling statutes.
The enabling statutes, in their entirety, are N.J.S.A. 43:16A-1 to -68 (PFRS); N.J.S.A. 43:15A-1 to -161 (PERS); N.J.S.A. 18A:66-1 to -93 (TPAF); N.J.S.A. 53:5A-1 to -47 (SPRS); N.J.S.A. 43:16-1 to -21 (CPFPF); N.J.S.A. 43:6A-1 to -47 (JRS); and N.J.S.A. 43:7-7 to -27 (POPF)-all of which we have considered in great depth. For purposes of our plain text analysis, the pertinent language of each statute is nearly identical or substantially similar: "Upon retirement for [ordinary, accidental, or special] disability, a member shall receive" the applicable retirement allowance. See, e.g., N.J.S.A. 43:16A-6(2), -6.1(b), -7(2) (PFRS) (emphasis added); N.J.S.A. 18A:66-41, -42 (TPAF) (emphasis added); N.J.S.A. 53:5A-9(b) (SPRS) (emphasis added).
III.
We begin by addressing whether N.J.A.C. 17:1-6.4 -the separation from service rule-is consistent with the legislative intent expressed in the statutes governing the State retirement systems. This new rule generally requires disability retirement applicants to prove that their asserted disability is "the reason the member left employment." N.J.A.C. 17:1-6.4(a). The rule also bars members *398 from applying for a disability retirement if they voluntarily or involuntarily terminate service for any of the following reasons:
1. Removal for cause or total forfeiture of public service;
2. Settlement agreements reached due to pending administrative or criminal charges, unless the underlying charges relate to the disability;
3. Loss of licensure or certification required for the performance of the member's specific job duties;
4. Voluntary separation from service for reasons other than a disability; and
5. Job abolishment or reduction in force.
[N.J.A.C. 17:1-6.4(b).]
During its rulemaking, the Division stated that "[d]isability retirement benefits are intended for members who become disabled while in active service and can no longer work, not for members who have voluntarily or involuntarily terminated service for some other reason." 48 N.J.R. 1306(a) (June 20, 2016). It noted that, "[i]f their service ends on the basis of other grounds, some members decide to apply for a disability retirement, in order to try to receive the highest retirement benefits available under their former membership." Ibid.
According to the Division, the separation from service rule "is intended to prevent members from applying for a disability retirement benefit when their service has voluntarily or involuntarily terminated for reasons unrelated to a disability." Ibid. It explained that such former members
do not qualify for disability retirement benefits, as they were not totally and permanently disabled from performing *935 their job duties when their service ended; their public service ended for a reason completely unrelated to a physical or mental disability that keeps them from continuing to perform their job duties.
[Ibid. ]
The purpose of the separation from service rule, according to the Division, "is to prevent individuals from applying for disability retirement benefits who are ineligible and do not qualify." Ibid.
A.
The NJEA argues that under the statutory framework governing the State-administered retirement systems, "members are not disqualified from disability retirement if they are separated from *399 service for reasons other than their disability." According to the NJEA, members who suffer a qualifying disability must receive disability retirement benefits, even if their separation from public service is for a reason unrelated to the disability, such as termination for cause. It contends that the separation from service rule adds a requirement for receiving disability retirement benefits that is not present in the enabling statutes. In essence, it argues that the inquiry should end with the recognition that the statutes' eligibility provisions do not expressly require that retirement disability applicants leave service because of the disability.
It is true that the plain text of the enabling statutes does not explicitly say that a disability retirement applicant must have left public service due to a disability. But still, the statutes governing the retirement systems make clear that, although a person eligible for benefits is entitled to a liberal interpretation of a pension statute, "eligibility [itself] is not to be liberally permitted." Smith v. Dep't of Treasury, Div. of Pensions & Benefits, 390 N.J. Super. 209, 213, 915 A.2d 48 (App. Div. 2007). It is obvious to us that there is no such explicit text in the enabling statutes because it is common sense that disability retirees leave their jobs due to a purported disability. After all, the employee seeks disability retirement benefits.
Applying our standard of review-by considering the entire enabling legislation and statutory policies-we conclude that the premise of NJEA's contention (that membership is the sole qualification for receiving disability retirement benefits) is incorrect for several reasons.
First, various eligibility statutes presume that an applicant is employed when filing a disability retirement application. In general, an eligibility statute provides applicable guidelines for determining whether an applicant qualifies for benefits. To that end, there are numerous references to a disability applicant's current employer or employment duty. See, e.g., N.J.S.A. 18A:66-39(b) (TPAF statute allowing the employer to apply for disability retirement on behalf of the employee); N.J.S.A. 18A:66-39(c) (TPAF
*400 statute requiring employer certification as part of application); N.J.S.A. 18A:66-2(e) (TPAF statute defining "[e]mployer" in the present tense as "the State, the board of education or any educational institution or agency of or within the State by which a teacher is paid" (emphasis added) ); see also N.J.S.A. 43:16A-7(1) (providing that, for a PFRS member to receive accidental disability retirement benefits, the member must prove incapacity for "the performance of his [or her] usual duty and of any other available duty in the department which his [or her] employer is willing to assign to him [or her]'' (emphasis added) ); N.J.S.A. 43:16A-1(6) (PFRS statute defining "[e]mployer" in the present tense as "the State of New Jersey, the county, municipality or political subdivision thereof which pays the particular *936 policeman or fireman" (emphasis added) ). The eligibility statutes also require a finding that the applicant is "incapacitated for the performance of duty." E.g., N.J.S.A. 18A:66-39(b).
True, the TPAF and PERS statutes allow membership to continue for two years following the final pension contribution. N.J.S.A. 18A:66-7(a) (TPAF) (stating generally that membership shall cease if the member "discontinue[s] his [or her] service for more than two consecutive years"); N.J.S.A. 43:15A-7(e) (PERS) (indicating that "[m]embership of any person in the retirement system shall cease if he [or she] shall discontinue his [or her] service for more than two consecutive years"). But even if one is technically a member, a terminated former employee removed for cause has no employer from which to receive assignments, or duty to perform during that two-year period. Thus, the references in the eligibility statutes-to a current employer and a current duty-render it unlikely that the Legislature intended membership to be the sole qualification for disability retirement benefits.
Second, rehabilitation statutes entitle a disability retiree whose disability has abated to return to active service. Klumb v. Bd. of Educ. of Manalapan-Englishtown Reg'l High Sch. Dist., 199 N.J. 14, 33-35, 970 A.2d 354 (2009) ; N.J.S.A. 18A:66-40(a) (TPAF) ; N.J.S.A. 43:16A-8(2) (PFRS) ; N.J.S.A. 43:15A-44(a) (PERS) ;
*401 N.J.S.A. 43:16-2 (CPFPF) ; N.J.S.A. 43:7-12 (POPF). For example, if a medical report shows that a TPAF disability retirement beneficiary "is able to perform either his [or her] former duty or other comparable duty which his [or her] former employer is willing to assign," he or she must "report for duty." N.J.S.A. 18A:66-40(a). Rehabilitation provisions have been present in the TPAF, PERS, PFRS, CPFPF, and POPF statutory schemes for decades.[2] Pursuant to Klumb, 199 N.J. at 32, 970 A.2d 354, and In re Allen, 262 N.J. Super. 438, 444, 621 A.2d 87 (App. Div. 1993), disability retirees must be returned to the same status and position held at the time of retirement, if available, after proving rehabilitation. Returning to active service presumes that, at the time the beneficiary left public service, he or she actually had a duty. E.g., N.J.S.A. 18A:66-40 (TPAF). And so, a beneficiary who previously left public service for some reason other than a disability-like termination for cause-would have no employment or work duty from which to return.
The rehabilitation statutes presume that, unlike other retirees attempting to return to state service, the only obstacle to a disability retiree's reemployment is the disability itself. Once the disability abates, the disability retirement beneficiary may be entitled to reinstatement. See Allen, 262 N.J. Super. at 444, 621 A.2d 87 (interpreting the rehabilitation statutes, and observing that, "[t]he Legislature clearly recognized that individuals returning from a *937 disability retirement are in a unique situation, *402 plainly different from all other employees returning to active service ... [and t]heir separation from employment is unlike the voluntary separation of other civil servants" (emphasis added) ). The statutory language expressly conditions reinstatement for disability retirees upon disability rehabilitation. It logically follows then that disability retirees must have left public service because of the disability in the first instance; unlike someone who has been terminated for cause.
If the NJEA were correct that any member could receive disability retirement benefits even after leaving public employment for an independent reason, a member removed for cause could arguably receive disability retirement benefits, and then argue for reinstatement by operation of Klumb, Allen, and the rehabilitation statutes, following rehabilitation from the purported disability. There is no evidence that the Legislature intended, and nothing in the text of the applicable statutes supports, such an absurd result. See Gallagher v. Irvington, 190 N.J. Super. 394, 397, 463 A.2d 969 (App. Div. 1983) (indicating that "[a]n absurd result must be avoided in interpreting a statute").
Third, the NJEA's interpretation of the enabling legislation conflicts with public policy declared in other statutes. For example, the civil service statutes declare that, "[i]t is the public policy of this State to provide public officials with appropriate appointment, supervisory and other personnel authority to execute properly their constitutional and statutory responsibilities." N.J.S.A. 11A:1-2(b). And "[i]t is the public policy of this State to encourage and reward meritorious performance by employees in the public service and to retain and separate employees on the basis of the adequacy of their performance." N.J.S.A. 11A:1-2(c). Public bodies obviously have the power to remove employees for cause. E.g., N.J.S.A. 11A:2-6(a)(1) (indicating that the Civil Service Commission has power to remove covered career service employees following a hearing); N.J.S.A. 40:69A-37(b) (stating that local councils have authority to remove any municipal officer for cause); N.J.S.A. 26:3-19 (providing that appointees of local *403 health boards may not be removed except for cause following a hearing). If the NJEA's interpretation were correct, then employees removed for cause could potentially override the personnel decision-making abilities of public agencies.[3]
Fourth, the NJEA misplaced reliance on several unpublished opinions, which we rendered before the promulgation of the separation from service rule. See Bogart v. Bd. of Trs. of P.F.R.S., No. A-2167-14, 2016 WL 3563144 (App. Div. July 1, 2016) (determining that although the applicant pled guilty to disorderly conduct, the *938 board failed to account for the applicant's PTSD diagnosis in instituting a total forfeiture of his pension); Bergen Cty. v. Bd. of Trs. of P.F.R.S., No. A-5756-11, 2013 WL 5575905 (App. Div. Oct. 11, 2013) (determining that although the applicant left employment as part of a settlement agreement with the county regarding his disciplinary action, the board properly granted him disability benefits due to his psychiatric symptoms and substance abuse that left him permanently and totally disabled); K.K.N. v. Bd. of Trs. of P.F.R.S., No. A-4651-13, 2015 WL 10844531 (App. Div. May 13, 2016) (determining that although the applicant was terminated, she settled a lawsuit alleging wrongful termination, she suffered from PTSD following incidents of abuse and harassment in her employment, and thus was entitled to ordinary disability); *404 Coyle v. Bd. of Trs. of T.P.A.F., No. A-6101-12, 2015 WL 1258034 (App. Div. Mar. 20, 2015) (applicant left employment due to mental ailments resulting from his employment and received disability retirement). None of these cases addressed whether disability retirement applicants are eligible for benefits unrelated to the disability.
Fifth, the NJEA's reliance on Frigiola v. State Board of Education, 25 N.J. Super. 75, 95 A.2d 491 (App. Div. 1953), and Gladden v. Board of Trustees of P.E.R.S., 171 N.J. Super. 363, 409 A.2d 294 (App. Div. 1979), is equally unpersuasive. In Frigiola, 25 N.J. Super. at 81, 95 A.2d 491, the court found the board's thirty-day delay was not authorized by the governing statute, which expressed a "manifest declaration of the legislative intent" that teachers "shall be retired for disability" upon a finding of disability. In Gladden, the Board of Trustees of PERS implemented a rule that any employee "not paid in each of the four calendar quarters" would be ineligible for PERS membership. Gladden, 171 N.J. Super. at 373, 409 A.2d 294 (quoting N.J.A.C. 17:2-2.3(a)(4) (1979) (amended 1983) ). The court found that although in "most cases" the rule may be "necessary," its application to bar the employee, who received a semi-annual salary payment pursuant to statute, violated statutory policy. Id. at 374, 409 A.2d 294. Neither Frigiola nor Gladden supports the NJEA's proffered interpretation in this case.
Sixth, contrary to the NJEA's contention that the separation from service rule "improperly provides for the forfeiture of the right to disability retirement benefits" and "seeks to take away" those benefits from members who leave public service for reasons other than disability retirement, the separation from service rule takes nothing away from members. Members who leave public service for reasons unrelated to a disability are not entitled to disability retirement benefits in the first instance. Nothing is being taken away, and the automatic forfeiture statutes do not and cannot override the rehabilitation statutes.
*405 B.
As to the validity of N.J.A.C. 17:1-6.4(b)(5) (dealing with a "[j]ob abolishment or [RIF]"), we make the following observations and modification. A member whose position may be the subject of a RIF is eligible for retirement disability benefits before the effective date of the abolishment of that position, so long as the member is unable to work due to the purported disability. If the member suffers from, or discovers, a disabling injury while looking for new work-in anticipation of the abolishment-then the member would likewise be entitled to apply for such benefits. But unlike in New Jersey Education Ass'n v. Board of Trustees of T.P.A.F., No. A-3158-15, 2017 WL 2979397 (App. Div. July 13, 2017) (slip op. at 8) -where we *939 remarked that the NJEA had not demonstrated how the existing legislation could render a TPAF member (who was terminated for a non-disability reason) otherwise eligible for a disability retirement-the NJEA has partially made such a showing as it relates to the abolishment of a tenured teaching position due to a RIF.
For example, a teacher who loses a job due to a RIF remains on a reemployment list and, based on seniority, is entitled to reemployment when a vacancy occurs, if still qualified for the position. N.J.S.A. 18A:28-12. A similar provision exists for PFRS. N.J.S.A. 43:16A-3(5) ; Cologna v. Bd. of Trs. of P.F.R.S., 430 N.J. Super. 362, 365, 64 A.3d 995 (App. Div. 2013). Such a teacher, however, may suffer or discover a disability after the abolishment of the position pending employment reinstatement. Although the abolishment of the position temporarily alters the employer-employee relationship, the teacher would arguably have an "employment duty"-based on seniority pending recall-from which to return. Consequently, pursuant to N.J.A.C. 17:1-6.4(b)(5), that teacher, who suffers from a disability pending recall, might be unable to return to the recalled work duty due to the disability.
A plain reading of N.J.A.C. 17:1-6.4(b)(5)-under this rare fact pattern-would be inconsistent with the purpose of the separation of service rule and the overall framework of the enabling, eligibility, *406 and rehabilitation statutes, and policies applicable to the State public retirement systems. Nevertheless, we choose to modify Section (b)(5) rather than completely invalidate it.
Applying Section (b)(5) to teachers whose jobs have been abolished due to a RIF and who have not suffered a disability pending reinstatement is consistent with the enabling statutes and related legislative directives. Such an application of Section (b)(5) also accords with our conclusion in New Jersey Education Ass'n, slip op. at 8, that a TPAF member is ineligible for disability retirement when that member's employment has been terminated for a non-disability reason. Therefore, invalidation of Section (b)(5) is unwarranted.
But modification of Section (b)(5) is appropriate for those public employees whose positions have been abolished due to a RIF, and who have suffered a disability pending reinstatement to a recalled job. Teachers, and other public retirement system members in this unique position, should be allowed to apply for and, if otherwise eligible, receive disability retirement benefits. That is so because such members would have an "employment duty" from which to return (even though the employer-employee relationship has been temporarily altered pending reinstatement), and the purported disability would arguably prevent the member from resuming the job duties in the recalled position. Consequently, Section (b)(5) is modified accordingly.
IV.
We now turn to N.J.A.C. 17:1-7.5 -the so-called subsequent IME amendment-which governs the Division's treatment of disability retirement applications after filing. The Re-adoption added subsections (c)(1) through (c)(4). On this point, we partially agree with the NJEA that the Division's action was unreasonable.
In general, if the Medical Review Board (MRB) decides that it requires additional information regarding a disability retirement application, the Disability Review Section (DRS) will schedule an initial IME, provided at no cost to the applicant.
*407 N.J.A.C. 17:1-7.5(c)(1). If the applicant "fails to attend and fails to cancel the *940 initial IME scheduled by the [DRS], the applicant will be required to pay for any subsequent medical examinations arranged by the [DRS]." N.J.A.C. 17:1-7.5(c)(2). "Failure to provide payment for the rescheduled IME within [ninety] days of the missed appointment date will result in the dismissal of the disability retirement case." N.J.A.C. 17:1-7.5(c)(3). The applicant "will be responsible to pay the IME's contractual rate for any subsequent IME required when additional medical documentation is submitted after the initial medical examination." N.J.A.C. 17:1-7.5(c)(4).
The NJEA argues that the governing statutes do not authorize the Division to require applicants to pay for IMEs or to cancel applications for failure to pay for an IME. The NJEA also argues that the subsequent IME amendment's lack of a good cause exception and failure to specify the method for calculating IME contractual rates render the regulation capricious.
Although the governing statutes generally allow the MRB to order IMEs to supplement information provided by an applicant in certain circumstances, they are silent regarding which party must pay for the IMEs. E.g., N.J.S.A. 43:16A-8 (PFRS) ; N.J.S.A. 43:15A-42, -43 (PERS); N.J.S.A. 18A:66-39 (TPAF) ; see also N.J.A.C. 17:2-6.26 (PERS regulation explaining that an IME will be required only when medical documentation accompanying the application is insufficient). The Division argues that this silence authorizes the subsequent IME amendment because, unlike in other contexts-see Unemployment Compensation Law, N.J.S.A. 43:21-15(b) -the Legislature did not specifically prohibit charging applicants.
To be sure, the Unemployment Compensation Law, prevents the Department of Labor and Workforce Development from imposing any fees upon unemployment compensation applicants. According to the Division, because the Legislature could have specified that disability retirement applicants shall not be charged any fees, as it did in the unemployment compensation context, its *408 failure to do so within the pension statutes authorizes the Division to shift IME costs onto applicants.
But, the Unemployment Compensation Law, unlike the pension statutes, does not contemplate an implementing agency ordering an applicant to attend a costly IME as a condition to an application. N.J.S.A. 43:21-1 to -24.30. Indeed, an applicant's medical condition is irrelevant to unemployment compensation benefits. The pension statutes' silence, standing alone, is therefore not evidence that the Legislature authorized the Division to shift IME costs onto applicants.
Any interpretation of the legislative silence regarding the cost of IMEs (purportedly $900 for physical IME and $1025 for a psychiatric IME) that places potentially prohibitive financial burdens upon applicants is unreasonable, and is certainly not a liberal construction in favor of the beneficiaries, as precedent requires. Harris v. Bd. of Trs. of P.E.R.S., 378 N.J. Super. 459, 465, 876 A.2d 305 (App. Div. 2005) (citing Steinmann v. Dep't of Treasury, 116 N.J. 564, 572, 562 A.2d 791 (1989) ). Even if the Division promulgated the subsequent IME amendment with a legitimate purpose-to deter applicants from missing scheduled IME appointments-there is no evidence that the Legislature ever intended for applicants to bear the entire cost of an IME upon the Division's unilateral determination that the applicant acted negligently. Although we invalidate N.J.A.C. 17:1-7.5(c)(2), (c)(3), and (c)(4), we uphold N.J.A.C. 17:1-7.5(c)(1) because that provision merely establishes that the initial IME will be provided at no cost to the applicant.
*941 V.
The NJEA argues that the Division was without authority to promulgate N.J.A.C. 17:1-7.10(a)(1) and (a)(2)-the documentation amendments-and that they are arbitrary because they fail to include a good cause exception.
Documentation amendment (a)(1) requires applicants to "submit all required documentation within six months of submitting the *409 disability retirement application, or the disability retirement application will be cancelled." N.J.A.C. 17:1-7.10(a)(1). The NJEA argues that the Division has no authority to place time limitations on the submission of medical information, and cannot dismiss an application for failure to satisfy a time limitation.
The NJEA's reliance on Frigiola for this proposition is misplaced. The applicable statute in Frigiola declared that the pension board "shall" retire an applicant upon approving the application, but the board delayed the effective date of the employee's retirement by thirty days following its approval. Frigiola, 25 N.J. Super. at 78-81, 95 A.2d 491. Frigiola involved a board rule that violated a "manifest declaration of ... legislative intent." Id. at 81, 95 A.2d 491. Here, there is no violation of legislative intent, express or otherwise.
The NJEA contention that documentation amendment (a)(1) "limits pension rights, which are to be liberally administered in favor of the members they are intended to benefit," misses the mark. The documentation amendment does not limit pension rights. It requires cancellation and resubmission of the application if the applicant fails to produce "all required documentation" within a six-month grace period. N.J.A.C. 17:1-7.10(a)(1).
N.J.A.C. 17:1-7.10(a), which predated the Re-adoption and established the documentation requirement, merely called for applicants to submit with their applications "all the medical information they can supply relative to their disability" that would "assist" the retirement system "in determining eligibility of the applicants for disability retirement." The pre-existing rule therefore had required applications to be complete at the time of filing. Documentation amendment (a)(1) merely added a grace period of six months in which applicants may submit additional documentation. Rather than dismiss unsupported applications outright, the Division must wait six months.
Agencies, like the Division, "may exercise powers that are expressly granted by statute and those fairly implied as necessary *410 to carry out their assigned function." Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 12, 970 A.2d 347 (2009). As we have previously stated, the Division has "wide discretion in the exercise of [its] responsibility," particularly in light of its expertise and experience in the area of disability retirement applications. N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 310 N.J. Super. 224, 239-40, 708 A.2d 708 (App. Div. 1998), aff'd, 158 N.J. 211, 729 A.2d 21 (1999). Additionally, the failure to include an express "good cause" exception within the text of the regulation does not render it arbitrary and capricious. See In re Regulation of Operator Serv. Providers, 343 N.J. Super. 282, 327, 778 A.2d 546 (App. Div. 2001) (holding that a regulation is presumed valid against a challenge that it is arbitrary, capricious, or unreasonable).
The Legislature entrusted the Division with the authority to promulgate regulations to administer retirement systems.[4] The pension statutes expressly reference disability retirement applications, but do *942 not contain any detail whatsoever regarding the procedural aspects of the application process itself. The Legislature therefore delegated that authority to the Division. Documentation amendment (a)(1) falls within that statutory grant of authority. Cf. In re Middlesex Reg'l Educ. Servs. Comm'n Name Change Request, 453 N.J. Super. 243, 255, 180 A.3d 1190, 2018 WL 672156, at *5 (App. Div. 2018) (holding that an agency has the power to amend a commission's name because such power was utilized for a "minor" change and "so obviously within the purview of the State Board's authority, that the Legislature chose not to detail that authority in the statutes").
Next, documentation amendment (a)(2) permits the Division to charge applicants for the cost of any addenda, if "additional documentation that existed at the time of the [IME] is submitted after the IME." N.J.A.C. 17:1-7.10(a)(2). This provision charges *411 applicants for supplemental reports prepared by a Board-designated independent medical examiner. We invalidate documentation amendment (a)(2) for the same reasons that we invalidate N.J.A.C. 17:1-7.5(c)(2) through (c)(4); and need not reach the NJEA's good cause contention.
VI.
The NJEA challenges N.J.A.C. 17:1-7.10(e)-the certification amendment-which states that the Division "reserves the right to require [an applicant] to sign a sworn certification that no underlying condition existed related to the disability for which the [applicant] is seeking a benefit."
The NJEA argues that the court should invalidate the certification amendment because it conflicts with the accidental disability retirement statutes. According to the NJEA, the certification amendment constitutes "an attempt to foreclose consideration of disabilities not associated with the traumatic event." It contends that even if "a pre[-]existing condition contributes to the member's disability," it "does not bar the member from receiving accidental disability benefits." Thus, it claims that the certification amendment "conflicts with the applicable law."
The accidental disability statutes require the asserted disability to be the "direct result of a traumatic event." N.J.S.A. 18A:66-39(c) (TPAF) ; N.J.S.A. 43:15A-43 (PERS) ; N.J.S.A. 43:16A-7(1) (PFRS). The Supreme Court clarified this standard in Richardson v. Board of Trustees of P.F.R.S., 192 N.J. 189, 927 A.2d 543 (2007). There, the Court held that to constitute a traumatic event, the injury must be "caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work)." Id. at 212-13, 927 A.2d 543. "[W]here the disability arises out of a combination of pre-existing disease and work effort, a traumatic event has not occurred ...." Id. at 211, 927 A.2d 543.
"[T]he Legislature sought to prohibit the grant of accidental disability benefits to a member disabled by a pre-existing condition, *412 alone or in combination with work effort ...." Id. at 210, 927 A.2d 543. The certification amendment reasonably allows the Division to ask applicants to confirm the existence of any related pre-existing conditions.
Nonetheless, the NJEA argues that, "contrary to" the certification amendment, "the presence of a pre[-]existing condition can be considered in an accidental disability application." In other words, the NJEA suggests that the certification amendment forecloses the consideration of a pre-existing condition when deciding an application.
*943 In support of its argument that the presence of a pre-existing condition can be considered as part of the accidental disability application, the NJEA cites several cases decided before the Richardson Court clarified the meaning of "traumatic event" in 2007. See Cattani v. Bd. of Trs. of P.F.R.S., 69 N.J. 578, 355 A.2d 625 (1976) ; Gerba v. Bd. of Trs. of P.E.R.S., 83 N.J. 174, 416 A.2d 314 (1980) ; Korelnia v. Bd. of Trs. of P.E.R.S., 83 N.J. 163, 416 A.2d 308 (1980) ; Hillman v. Bd. of Trs. of P.E.R.S., 109 N.J. Super. 449, 263 A.2d 789 (App. Div. 1970).
We need not decide whether the Richardson standard forecloses the consideration of pre-existing conditions, because the NJEA misreads the certification amendment. The amendment does not forbid the consideration of a pre-existing condition as part of the ultimate determination whether to approve or deny the application. Nor does it condition the grant of an accidental disability benefit upon the information contained in the applicant's certification. The certification amendment is merely informational. It provides a mechanism by which the retirement system may determine if a pre-existing disability is involved in the case. At the very least, that information is relevant to the resolution of a disability retirement application pursuant to the Richardson standard.
Critically, the certification amendment does not preclude the grant of a benefit to an applicant who certifies the existence of a pre-existing condition. It merely allows the agency to confirm if a pre-existing condition is present, but it does not predetermine any result. Certainly, if a retirement system denies an individual *413 application in the future by breaching the Richardson standard, applicants may appeal that denial in the normal course.[5]
VII.
The NJEA also challenges N.J.A.C. 17:1-7.10(f)-the one retirement application amendment-which sets forth that an applicant who has filed any type of disability retirement application cannot file a separate application for any other type of retirement while the prior application is pending.
The NJEA argues that the one retirement application amendment frustrates the purpose and intent of the pension system. According to the NJEA, applicants suffer a hardship because they are "forced to discontinue service" when applying for a disability retirement benefit. An applicant thus earns no income while awaiting the resolution of the application. The NJEA argues that an applicant "clearly entitled to a service retirement" should collect the service retirement allowance while the disability retirement application is pending, with retroactive "adjustments made after the disability application is determined."
The one retirement application amendment is consistent with legislative intent. Membership in several of the retirement systems automatically ceases "upon retirement," N.J.S.A. 18A:66-7(d) (TPAF), *944 N.J.S.A. 53:5A-7 (SPRS), N.J.S.A. 43:6A-5 (JRS), or when the member becomes a "beneficiary," N.J.S.A. 43:16A-3(3) (PFRS). If an applicant receives a service retirement allowance *414 while the disability retirement application is pending, the applicant may no longer be a "member" of the retirement system because he or she has "retired" and is now a "beneficiary." If no longer a member, an applicant is not encompassed by the disability retirement statutes. See, e.g., N.J.S.A. 18A:66-39(b) (TPAF statute providing that "a member" shall be retired for ordinary disability if otherwise eligible).
As noted by the Division, the disability retirement statutes refer to "the application" or "the written application" in the singular. E.g., N.J.S.A. 18A:66-39 (TPAF) ; N.J.S.A. 43:16A-6(1) (PFRS) ; N.J.S.A. 43:15A-43 (PERS). And the NJEA concedes that under the statutes, members can only receive one retirement benefit at a time. The NJEA does not cite any statutory provision that conflicts with the one application rule. Although the pension statutes are to be liberally construed, Uricoli v. Bd. of Trs. of P.F.R.S., 91 N.J. 62, 76-77, 449 A.2d 1267 (1982), that principle does not prevent the Division's regulations from effecting legislative intent.
VIII.
Finally, the NJEA initially challenged N.J.A.C. 17:1-7.10(j)-the notification amendment-which states that members who are granted accidental disability benefits "will be advised that they are responsible for notifying the Division if the disabling condition improves enough to allow the member to return to gainful employment, or if the member becomes employed again." The notification amendment contains two separate notification requirements: (1) upon a retiree's reemployment; and (2) upon rehabilitation of the disability. At oral argument, the NJEA withdrew its appeal of the notification amendment; however, for completion's sake, we briefly address the NJEA's arguments contained in its merits brief, and the validity of N.J.A.C. 17:1-7.10(j).
Generally, the NJEA argued that the notification amendment conflicts with law because the disability retirement statutes only require proof of incapacity in the general area of ordinary employment.
*415 See Skulski v. Nolan, 68 N.J. 179, 205-06, 343 A.2d 721 (1975) (holding that the appropriate standard for permanent disability under PFRS is whether the applicant is "employable in the general area of his [or her] ordinary employment" (quoting Getty v. P.O.P.F., 85 N.J. Super. 383, 390, 204 A.2d 883 (App. Div. 1964) ) ). The NJEA contended "[a]pplicants are not required to show that they are completely unemployable." According to the NJEA, the notification amendment arbitrarily fails to account for pension statutes that do not require proof that an applicant is generally unemployable.
The notification-of-reemployment provision of the notification amendment advances the legislative directives contained in statutes that govern the treatment of beneficiaries post-retirement. The TPAF and PERS statutes require the Division to reduce pension awards if the beneficiary is "engaged in an occupation." See N.J.S.A. 18A:66-40(a) (TPAF) ; N.J.S.A. 43:15A-44(a) (PERS). And the statutes contemplate a member's possible reemployment in a position that is eligible for participation within the same retirement system. See N.J.S.A. 18A:66-40(b) (TPAF) ; N.J.S.A. 43:15A-44(b) (PERS).
It is reasonable to infer from these statutes that the Legislature intended for the Division to be aware when disability retirement beneficiaries return to work. Therefore, it is reasonable for the Division to *945 require notification upon reemployment, and such notification does not conflict with law. The NJEA's reliance upon Skulski, 68 N.J. at 201-08, 343 A.2d 721, was misplaced because that case involved the standard for qualifying for disability benefits in the PFRS system, and did not involve the statutory treatment of beneficiaries post-retirement.
The notification amendment's requirement that beneficiaries notify the Division "if the disabling condition improves enough to allow the member to return to gainful employment" is also reasonable and consistent with the governing statutes. N.J.A.C. 17:1-7.10(j). The NJEA claimed that this provision conflicts with law *416 because beneficiaries need not be generally unemployable to receive disability benefits.
But the Division's awareness when a disability retirement beneficiary is able to return to employment may further its enforcement of the rehabilitation statutes. For example, the TPAF statute provides that the retirement system may designate a physician to perform a medical examination for beneficiaries under the age of sixty, for a period of five years following retirement. N.J.S.A. 18A:66-40(a). If the report reveals that the beneficiary "is able to perform either his [or her] former duty or other comparable duty which his [or her] former employer is willing to assign to him [or her]," the beneficiary must report for duty. Ibid. (emphasis added).
The PERS statute contains identical language. N.J.S.A. 43:15A-44(a). Similarly, the PFRS statute allows the system to order medical examinations of disability retirees under the age of fifty-five within five years following retirement to determine if the disability retirement beneficiary "is able to perform either his [or her] former duty or any other available duty in the department." N.J.S.A. 43:16A-8(2) (emphasis added). Beyond specifying age limits (under sixty for TPAF and PERS; under fifty-five for PFRS) and time frames (within five years of retirement), the Legislature granted the Division discretion to decide the circumstances in which it will order a medical examination of a disability retiree to determine if he or she is fit for employment in any capacity with the former employer. The Division may use the information provided by disability retirees to aid its decision whether to order a post-retirement medical examination, if the other statutory conditions (the age and time frame limitations) are satisfied. Therefore, the requirement for disability retirees to provide the information in the notification amendment is not arbitrary and is consistent with the law.
The NJEA also argued that this aspect of the amendment improperly asks beneficiaries to render a medical opinion. Yet the notification amendment does not ask the beneficiary to render a *417 medical opinion, but rather asks the beneficiary to update the Division if he or she believes that he or she is able to work due to the condition's improvement. The notification does not permit the Division to rely upon the beneficiary's notification as medical evidence, or to deny or adjust allowances based upon the beneficiary's notification. Rather, as discussed previously, the Division may merely wish to use that information to order a subsequent medical examination in accordance with the rehabilitation statutes.
The NJEA claimed the Division may rely upon the notifications to reopen and reconsider prior awards, which it suggests would be improper. The NJEA expressed concern that the Division may rely on the information provided by a retiree to determine that the retiree is rehabilitated, or to order medical examinations not in accordance with the statutory limitations. As we have previously indicated, the pension statutes specifically permit the Division to *946 adjust disability retirement benefits if a beneficiary obtains post-retirement employment. N.J.S.A. 43:15A-44(b) (PERS) ; N.J.S.A. 18A:66-40(b) (TPAF). And the NJEA's initial concerns about what the Division may or may not do in the future are not relevant to the final agency action challenged here: the Division's promulgation of the notification amendment. Raising concerns about a rule's possible application in future cases is not the same as challenging the rule's validity. Therefore, the NJEA did not satisfy its burden of demonstrating that the notification amendment is arbitrary and capricious. In re Adoption of N.J.A.C. 11:3-29, 410 N.J. Super. at 24-25, 979 A.2d 770.
The NJEA argued that, when retirees return to gainful employment, "the onus should be on the Division to send out regular notices to retirees reminding them of their obligation to update the Division, not on the retirees who have no expertise in pension matters." However, when authorized to do so, the Division has the discretion to choose how to effectuate legislative intent. In re Failure by the Dep't of Banking & Ins., 336 N.J. Super. at 262, 764 A.2d 494. That the Division could have chosen other means, more in accord with the NJEA's preferences, does not invalidate *418 the amended rule. Additionally, the observation that retirees "have no expertise in pension matters" is misguided. No such expertise is required to know if one is working or not, or to have a belief regarding whether one is able to work.
Affirmed in part; reversed in part; and modified in part.

We uphold this rule but slightly modify N.J.A.C. 17:1-6.4(b)(5) (pertaining to "[j]ob abolishment or reduction in force [ (RIF) ]"). We do so because in this limited instance, the NJEA has demonstrated that a teacher whose position has been abolished due to a RIF may be eligible for disability retirement benefits if that teacher is unable to return to a recalled position due to the purported disability. See infra Part III.B.

See L. 1967, c. 271 (TPAF); L. 1966, c. 67, § 5 (PERS); L. 1944, c. 255, § 8 (PFRS); L. 1944, c. 253, § 2 (CPFPF); L. 1969, c. 56, § 4 (POPF).
We were unable to locate rehabilitation statutes in the SPRS or JRS statutory schemes. However, the use of rehabilitation statutes in PERS, TPAF, POPF, PFRS, and CPFPF are generally applicable to the Division's authorization to administer all of the State pension systems. Nw. Bergen Cty. Utils. Auth. v. Donovan, 226 N.J. 432, 444, 143 A.3d 290 (2016) (holding that, "[s]tatutes that deal with the same matter or subject should be read in pari materia and construed together as a unitary and harmonious whole" (alteration in original) (quoting St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15, 878 A.2d 829 (2005) ) ); see also Klumb, 199 N.J. at 32, 970 A.2d 354 (applying the same principle in the public pension context).

Another panel recently rejected in an unpublished opinion an almost identical challenge from the NJEA in the context of a TPAF-specific regulation. Of course, we are aware that an unpublished opinion has no precedential value. R. 1:36-3. Nevertheless, a court may "acknowledg[e] the persuasiveness of a reasoned decision on analogous facts." Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 600, 170 A.3d 351 (App. Div. 2017).
In New Jersey Education Ass'n v. Board of Trustees of T.P.A.F., No. A-3158-15, 2017 WL 2979397 (App. Div. July 13, 2017), the NJEA challenged the 2015 promulgation of amended N.J.A.C. 17:3-6.1(f)(3), a TPAF regulation, which sets forth that, "[t]ermination of employment, voluntary or involuntary, that was caused by any reason other than the claimed disability disqualifies a member from disability retirement." The court found that the statutes governing TPAF, "[w]hen harmonized, ... render a TPAF member ineligible for a disability retirement when that member's employment has been terminated for a non-disability reason." N.J. Educ. Ass'n, slip op. at 8.

E.g., N.J.S.A. 18A:66-56 (TPAF) ; N.J.S.A. 43:15A-17 (PERS) ; N.J.S.A. 52:18A-96.

We decided a similar issue in New Jersey Education Ass'n, slip op. at 7. There, the NJEA challenged a TPAF regulation requiring that for accidental disability applications, "only those disabilities associated with the purportedly-disabling event shall be considered." N.J.A.C. 17:3-6.1(f)(1). We concluded the regulation reasonable and held that it conforms to the Richardson standard by ensuring that applicants do not receive benefits based on pre-existing conditions. N.J. Educ. Ass'n, slip op. at 7. The certification amendment's requirement is even less unreasonable, because it says nothing whatsoever regarding what the agency may or may not consider when processing applications. Rather, as discussed above, it is merely part of the deciding agency's information-gathering process.